1  JAMES R. LAWRENCE, III (*pro hac vice* pending)
   jlawrence@envisage.law
2  ANTHONY J. BILLER (*pro hac vice* pending)
   ajbiller@envisage.law
3  ENVISAGE LAW
   2601 Oberlin Road, Suite 100
4  Raleigh, North Carolina 27608
   Phone: 919.755.1317
5  Facsimile: 919.782.0452

6  SEAN P. GATES (SBN 186247)
   sgates@charislex.com
7  CHARIS LEX P.C.
   301 N. Lake Ave., Ste. 1100
8  Pasadena, CA 91101
   Phone: 626.508.1715
9  Facsimile: 626.508.1730

10 *Attorneys for Plaintiff Alex Berenson*

11

12                **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14 **ALEX BERENSON,**

15      **Plaintiff,**                    **COMPLAINT FOR DAMAGES AND
                                          INJUNCTIVE RELIEF**
16
        **v.**                           1. **VIOLATION OF THE FIRST
17                                           AMENDMENT**
   **TWITTER, INC.,**                    2. **FEDERAL FALSE ADVERTISING
18                                           AND UNFAIR COMPETITION**
        **Defendant.**                   3. **VIOLATION OF CALIFORNIA
19                                           COMMON CARRIER LAW**
20                                       4. **VIOLATION OF CALIFORNIA
                                            UNFAIR COMPETITION LAW**
21                                       5. **BREACH OF CONTRACT**
                                         6. **PROMISSORY ESTOPPEL**
22                                       7. **VIOLATION OF THE
                                            CALIFORNIA CONSTITUTION**
23                                       8. **UNJUST ENRICHMENT**
24
                                         **JURY TRIAL DEMANDED**
25

26

27

28

ENVISAGE LAW

**INTRODUCTION**

1.      Twitter is the world's preeminent global messenger service and foremost platform for journalism. According to its own mission statement, "defending and respecting the user's voice is one of our core values." Twitter, *Defending and respecting the rights of people using our services*, https://help.twitter.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Dec. 19, 2021). Unfortunately, despite Twitter's supposed commitment to freedom of speech, in the case of independent journalist Alex Berenson, the company broke its promises, its stated policies, and our laws, including a nearly 150-year-old California law that explicitly sets out its obligations as a company in the business of carrying messages.

2.      During 2020 and 2021, Mr. Berenson became a prominent critic of the governmental and public health response to the COVID-19 pandemic. Mr. Berenson made many statements on Twitter which, although controversial at the time, have since become conventional wisdom, most notably about the profound harm to children caused by remote learning and unnecessary school closures.

3.      Mr. Berenson's audience on Twitter soared as the pandemic continued, and in August 2021 his tweets were viewed approximately 182 million times. Despite the controversy around his statements, a senior Twitter executive repeatedly assured Mr. Berenson that the company backed his right to free expression and that he would continue to enjoy access to the platform. Even after he started critically covering the COVID-19 vaccines, in December 2020 the executive assured Mr. Berenson that his reporting "should not be an issue at all." In March 2021, the same executive told Mr. Berenson that "your name has never come up in the discussions around these policies [(i.e., potential censorship of Twitter users who criticized the vaccines and other COVID-19 policies)]."

2

COMPLAINT

4.      Relying on these assurances, and aware of Twitter's unique size and importance as a medium for journalism, Mr. Berenson did not seriously attempt to build alternate venues for his reporting before late May 2021. At that point, aware that government officials were increasingly calling for Twitter and other social media platforms to censor dissenting views on both COVID-19 policy and the COVID-19 vaccines, he began to publish on Substack, a newsletter platform with a far smaller audience than Twitter. But Twitter remained his primary outlet for journalism, and between May and August 2021, he provided readers thousands of tweets.

5.      Mr. Berenson's relationship with Twitter changed dramatically over the course of one week in July 2021. On Sunday, July 11, Dr. Anthony Fauci, President Joe Biden's Chief Medical Advisor, called Mr. Berenson's comments about COVID-19 vaccine hesitancy "horrifying." By Friday, President Biden himself piled on, blaming social media companies for "killing people" on account of their failure to adequately censor content. Hours after President Biden's comment, Twitter locked Mr. Berenson out of his account for the first time.

6.      On August 28, in the wake of even more calls for censorship from government officials, Twitter permanently suspended Mr. Berenson from its platform, citing "repeated violations of our COVID-19 misinformation rules." Mr. Berenson did not violate those rules. Twitter, on the other hand, broke its promises to Mr. Berenson as well as its policies, and violated his rights as it served the federal government's censorship demands.

7.      Twitter and other social media companies have repeatedly fended off lawsuits like this one using section 230 of the Communications Decency Act of 1996 or CDA. The companies have argued—and many courts have agreed—that section 230 gives them all the legal protections publishers enjoy but none of the obligations. Twitter has also argued that, as a private

COMPLAINT

company, it has even more fundamental rights to decide whether to publish material, rights that spring not just from section 230 but from the First Amendment.

8.      This lawsuit is not a rerun of these long-running disputes. For one thing, different laws are at issue, among them a California law that predates the CDA by 124 years and which limits Twitter's right to discriminate against the speech it carries. Enacted in 1872, the law defines any company that "offers to the public to carry persons, property, or messages" as a "common carrier." As the law then explains, "a common carrier must, if able to do so, accept and carry whatever is offered to him."

9.      Courts have repeatedly applied the 1872 law to telephone companies and other technologies that did not exist at the time it was enacted. Carrying messages for the public is, of course, the very core of Twitter's business. As the company itself explains, "Twitter is a social broadcast network that enables people and organizations to publicly share brief messages instantly around the world." Twitter, *About offensive content*, https://help.twitter.com/en/safety-and-security/offensive-tweets-and-content (last visited Dec. 19, 2021).

10.     Section 230, which preempts certain state and local laws, does not shield Twitter from the reach of California's common carrier statute or the California Constitution. Twitter's potential reliance upon section 230 as a defense against Mr. Berenson's claims asserting California speech-protection laws raises federal First Amendment issues that federal courts must adjudicate. If section 230 deprives Mr. Berenson of the benefits of California laws that require Twitter to meet its obligations as a messenger service, then the First Amendment itself is at stake, because section 230, a federal law, "is the source of the power and authority by which" Mr. Berenson's speech "rights are lost or sacrificed." *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 232 (1956).

11.     In fact, the Supreme Court has already signaled its awareness of these issues. Earlier this year, the Court's current longest-serving member, Justice Clarence Thomas, openly asked whether companies like Twitter are in fact common carriers subject to the "general requirement to serve all comers." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1222 (2021) (Thomas, J., concurring).

12.     Mr. Berenson also has a uniquely viable claim that Twitter acted on behalf of the federal government in censoring and barring him from to its platform. While courts have generally refused such "state actor" complaints against social media companies, the extraordinarily close nexus between the July 2021 statements by senior executive branch officials—including President Biden himself—calling for censorship by such companies and Twitter's corresponding immediate actions against Mr. Berenson mean that this issue merits closer scrutiny.

13.     Finally, courts have repeatedly held that even section 230 cannot and does not protect Twitter from Mr. Berenson's breach of contract and promissory estoppel claims, which again do not depend merely on Twitter's overall terms of service or broad promises about freedom of speech but on specific, repeated representations the company made to Mr. Berenson through a senior Twitter executive over a nearly one-year-period. Nor does section 230 bar Mr. Berenson's Lanham Act and California Unfair Competition Law claims premised on Twitter's false and misleading representations concerning his reporting on the platform.

14.     This case raises significant questions about private power and the state of free speech in America. Do our laws place any limitations on Twitter's power to discriminate against speakers—even as it becomes the most important outlet for journalism worldwide, in part because its promises of unfettered free speech have attracted an audience of hundreds of millions

of users? In February 2021, in response to complaints from the Indian government, Twitter

explained in a blog post that it "exists to empower voices to be heard" and that "[w]e will

continue to advocate for the right of free expression on behalf of the people we serve." Twitter

Safety, *Updates on our response to blocking orders from the Indian Government*, Feb. 10, 2021,

https://blog.twitter.com/en_in/topics/company/2020/twitters-response-indian-government. When

it banned Mr. Berenson six months later, Twitter proved otherwise. This lawsuit would be

unnecessary if the company had simply followed its own oft-repeated core principles—as well as

the general rules it created to monitor posts about COVID-19 and the specific promises it made

to Mr. Berenson. Now Twitter, as it has before, will claim that section 230 is a blanket shield

protecting it from any consequences for its behavior. But even section 230 does entirely not

exempt social media companies from the laws that govern everyone else.

## PARTIES

15.     Twitter is a Delaware corporation with a principal place of business located at

1355 Market Street, Suite 900, San Francisco, California 94103.

16.     Alex Berenson is a resident of the State of New York.

## JURISDICTION

17.     Twitter is a citizen of Delaware and California. Mr. Berenson is a citizen of New

York. Twitter and Mr. Berenson have complete diverse citizenship. Mr. Berenson seeks damages

of more than $75,000. This Court has subject matter jurisdiction over this case under 28 U.S.C.

§ 1332.

18.     This case presents questions that arise under the First Amendment. As such, this

Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. This Court has

supplemental jurisdiction over Mr. Berenson's state law claims under 28 U.S.C. § 1367.

COMPLAINT

19.     Twitter's headquarters are in San Francisco, California. This Court has general personal jurisdiction over Twitter under the Due Process Clause of the Fourteenth Amendment. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). This Court also has jurisdiction over Twitter pursuant to California's Long-Arm Statute, Cal. Code Civ. Proc. Code § 410.10, which provides that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

## VENUE

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Twitter's headquarters are in this judicial district. Further, Twitter's Terms of Service provide that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States."

## DIVISIONAL ASSIGNMENT

21.     Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco division because a substantial portion of the events giving rise to this case occurred at Twitter's corporate headquarters located in San Francisco.

## LEGAL FRAMEWORK

### I.     Twitter and the Telegraph

22.     Twitter's "social media platform . . . allows its users to electronically send messages of limited length to the public." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). A Twitter "user can post their own messages (referred to as tweeting)" and "may also respond to the messages of others (replying),

COMPLAINT

republish the messages of others (retweeting), or convey approval or acknowledgement of another's message by 'liking' the message." *Id.*

23.     As one of the world's leading social media websites, the company's user base numbers in the hundreds of millions. According to a 2019 survey, "[a]round one-in-five U.S. adults say they use Twitter." Adam Hughes & Stefan Wojcick, *10 facts about Americans and Twitter*, Pew Res. Ctr., Aug. 2, 2019, https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/. "In the three months ended December 31, 2020, [Twitter] had 192 million average [monetizable daily active users or] MDAU," meaning the number of "people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day." Twitter, Annual Report (Form 10-K), at 39 (Feb. 17, 2021). The company leverages this user base to derive billions of dollars in advertising and licensing revenues. *Id.* at 43.

24.     The ubiquity of the company's platform gives it significant influence over public conversation. Among U.S. adult Twitter users, "more than half of those users (55%) get news on the site regularly." Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, Pew Res. Ctr., Sept. 20, 2021, https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/. The demographics of Twitter users are different than the general American population, skewing younger and toward a particular political party, *see id.*, making Twitter a critical platform for engaging with these fellow citizens.

25.     Twitter has significant market power. According to one source, Twitter is now the second-largest social media platform in the world, trailing only Facebook/Meta. StatCounter, *Social Media Stats Worldwide*, https://gs.statcounter.com/social-media-stats (last visited Dec. 19,

2021). Twitter's market share appears to have increased since 2018, when one report placed the company as the third-largest platform, behind Facebook/Meta and Pinterest. Nina Angelovska, *Facebook Losing Users to Pinterest, Youtube and Twitter (Market Share By Region)*, Forbes (Jan. 7, 2019), https://www.forbes.com/sites/ninaangelovska/2019/01/07/facebook-loosing-users-to-pinterest-youtube-and-twitter-market-share-by-region/?sh=6ab17b227746.

26.     Upon information and belief, these reports underestimate Twitter's market power in the social media messaging market, because Twitter's platform differs significantly from the other entities included in the comparable market in the above-cited reports. Platforms such as Telegram are more like Twitter than Facebook/Meta is. Compared to those entities, Twitter is the clear market leader.

27.     Bolstering its market power, Twitter also boasts a significant patent portfolio, which it can use to exclude new market entrants and competitors. *Twitter Patent Portfolio – A Little Organic and Mostly Acquired*, GreyB, https://www.greyb.com/twitter-patent-portfolio/ (last visited Dec. 19, 2021). The company enjoys other incumbent advantages inherent in having the economies of scale to comply with an ever-growing number of data security and privacy regulations. *See, e.g.*, Cal. Civ. Code §§ 1798.100 to 1798.199.100.

28.     Twitter's role in public debate in the twenty-first century resembles that of the telegraph in the nineteenth. While the telegraph was initially thought to be owned and operated by the government, private companies commercialized the telegraph, creating "the possibility that the private entities that controlled this amazing new technology would use that power to manipulate the flow of information to the public when doing so served their economic or political self-interest." Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev., 2299, 2321 (2021).

29.     In 1872, the House of Representatives Appropriations Committee reported that "the Government must have its ultimate guarantee in the intelligence of the people," and that telegraph companies "have so hedged themselves in by alliances with press associations that no new or projected journal can have the use of the telegraph at rates not absolutely ruinous." *Id.* at 2322 (quoting H.R. Rep. No. 42-6, at 7 (1872)). The House Committee proposed that the telegraph should be subject to the "same general laws of equality of privileges" that applied to the postal service. *Id.* at 2323 (quoting H.R. Rep. No. 42-6, at 8 (1872)).

30.     The same year, the Senate Committee on Post-Offices and Post-Roads reported on "[t]he danger which would result if the control of the telegraph should pass into the hands of unscrupulous parties." S. Rep. No. 42-20, at 4 (1872). The Committee noted the "influenc[e] [on] public opinion and action in any important crisis [that] is possessed by those who control the telegraph." *Id.* "Such power is too vast to be confided to any private individual," the Committee concluded. *Id.* "It should be held by the Government under such restraints as would prevent its being wielded to the public detriment." *Id.*

31.     Legislatures responded by requiring telegraph operators to serve all comers. "Dozens of states enacted statutes of this sort between 1848 and the early twentieth century, as did the federal government." Lakier, *supra*, at 2320. Legislators justified these "common carrier or quasi-common carrier" statutes on the grounds that they "were necessary to safeguard the democratic nature of the government and the vitality of the press." *Id.* at 2319. "The result was the creation, by the end of the nineteenth century, of a rich body of state and federal common carrier law that not only promoted free speech values but did so quite intentionally in the belief that this kind of regulation was crucial to the preservation of the democratic character of the mass public sphere." *Id.* at 2324.

10

COMPLAINT

32.     The Supreme Court has upheld similar regulations against First Amendment challenges. As the Court put it in upholding the constitutionality of the fairness doctrine in, "[t]he right of free speech of a broadcaster, the user of a sound truck, or any other individual does not embrace a right to snuff out the free speech of others." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387 (1969). "[I]t is idle to posit an unbridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Id.* at 388. The Court explained that "[i]t would be strange if the First Amendment, aimed at protecting and furthering communications, prevented the Government from making radio communication possible by requiring licenses to broadcast and by limiting the number of licenses so as not to overcrowd the spectrum." *Id.* at 389; *see also Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("It would be strange . . . if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom."); Lakier, *supra*, at 2349-50 (discussing the same).

## II.     The Law Governing Common Carriers and Public Forums

33.     The current longest-serving member of the United States Supreme Court, Justice Clarence Thomas, recently observed that "our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J., concurring). After noting the historical example of the telegraph, *id.* at 1223, Justice Thomas observed that "digital platforms that hold themselves out to the public resemble traditional common carriers." *Id.* at 1224. "If the analogy between common carriers and digital platforms is correct, then an answer may arise for dissatisfied platform users who would appreciate not being blocked: laws that restrict the platform's right to exclude." *Id.* at 1225.

COMPLAINT

ENVISAGE LAW

34.     Twitter's home state of California has such a law. In 1872, the very same year the House and Senate Committees released their above-cited reports, California enacted a law defining the duties and obligations of common carriers. Relevant here, under the statute, "[e]very one who offers to the public to carry persons, property, or messages, *excepting only telegraphic messages*, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168 (emphasis added). (Prior to section 2168 being enacted in 1872, California courts were already applying common carrier principles to telegraph services. *See Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422, 424 (1859).) Notably, nothing in the text of section 2168 requires that a company have market power to be considered a common carrier.

35.     The California courts have applied this law to technologies that did not exist in 1872, finding that telephone and taxicab companies are common carriers. *See, e.g.*, *Goldin v. Pub. Utilities Comm'n*, 23 Cal. 3d 638, 662, 592 P.2d 289, 304 (1979) ("A company providing telephone services to the public is a common carrier (Civ. Code, § 2168), and as such may not discontinue services without good cause." (internal citations omitted)); *Bezera v. Associated Oil Co.*, 117 Cal. App. 139, 143, 3 P.2d 622, 623 (1931) ("The answer of the cab company, by failure to deny, admits that it was engaged in the business of carrying passengers for hire within and about San Francisco and that decedent was riding as a passenger for hire. This admission would seem to bring the cab company within the definition of a common carrier found in section 2168 of the Civil Code.").

36.     As the California Supreme Court has explained, "section 2168 defines a 'common carrier' carrier in expansive terms." *Gomez v. Superior Ct.*, 35 Cal. 4th 1125, 1130, 113 P.3d 41, 44 (2005). The *Gomez* court noted California's "broad" concept of common carrier principles

COMPLAINT

such as "carrier of persons for reward" juxtaposed against the narrower view taken by courts in other jurisdictions. *See id.* at 1133-36, 113 P.3d at 45-48.

37.     Twitter's services fit within section 2168's definition of a "common carrier." Twitter holds itself out to the public as an entity willing to carry messages. In this regard, by the company's own admission, Twitter's platform is "capable of delivering billions of *messages*, including images and video, to hundreds of millions of people a day." Twitter, Annual Report (Form 10-K), at 8 (Feb. 17, 2021) (emphasis added). At the same time, the company understands it faces competition from "[c]ompanies that offer products that enable people to create and share ideas, videos, and other content and information." *Id.* Twitter also says it "is an open service that's home to a world of diverse people, perspectives, and information," and that "[y]ou should be able to speak your mind and find credible information easily." Twitter, *Healthy conversations*, https://about.twitter.com/en/our-priorities/healthy-conversations (last visited Dec. 19, 2021).

38.     This Court has applied section 2168 to another twenty-first century technology: the ride-sharing application Uber. In one case, this Court rejected Uber's argument "that it is not a common carrier but that it is a 'broker' of transportation services," *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016), holding that the plaintiff had plausibly alleged "that Uber is a common carrier" under section 2168, *id.* at 787. In another case, this Court also rejected Uber's argument "that it is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app." *Doe v. Uber Techs., Inc.*, No. 19-CV-03310-JSC, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019). This Court noted "[c]ommon carrier liability can attach even for transportation services that are of possible use to only a fraction of the population." *Id.* (internal quotation marks omitted). "In sum, Uber's status

COMPLAINT

as an app-based transportation network does not preclude it as a matter of law from being held

liable as a common carrier." *Id.*[1]

39.     Under California law, common carriers like Twitter "must, if able to do so, accept

and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes

or is accustomed to carry." Cal. Civ. Code § 2169. In other words, since it is a common carrier

under California law, Twitter must "serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J.,

concurring). California law goes further, requiring a "common carrier of messages . . . must

transmit messages in the order in which he receives them." Cal. Civ. Code § 2208. "Every person

whose message is *refused* or postponed, contrary to the provisions of this Chapter, is entitled to

recover from the carrier his actual damages, and fifty dollars in addition thereto." *Id.* § 2209

(emphasis added).

40.     California case law confirms that a common carrier's right to refuse service is

narrow. In *People v. Brophy*, 49 Cal. App. 2d 15, 120 P.2d 946 (1942), which involved the use of

telephone services in connection with a bookmaking operation, the court stated that "common

carriers are not the censor of public or private morals." 49 Cal. App. 2d at 33. As the *Brophy*

court put it, a "telephone company has no more right to refuse its facilities to persons because of

a belief that such persons will use such service to transmit information that may enable recipients

thereof to violate the law than a railroad company would have to refuse to carry persons on its

trains because those in charge of the train believed that the purpose of the persons so transported

in going to a certain point was to commit an offense." *Id.*; *cf. Mason v. Western Union Telegraph*

---

[1] This Court ultimately rejected the plaintiff's common carrier theory because she had not
alleged facts sufficient to establish "a common carrier/passenger relationship" between her and
Uber. *Id.* at *8.

*Co.*, 52 Cal.App.3d 429, 439, 125 Cal. Rptr. 53, 58 (1975) ("We conclude that Western Union has no right of censorship except in the specific instances enumerated in Public Utilities Code section 7904 which instances do not include the right to refuse to transmit telegrams which may allegedly be libelous."). If common carriers cannot bar even libelous material, certainly speech about matters of public concern does not fall within such a carrier's narrow right to exclude. Of course, this case involves the narrow issue of Twitter's right to exclude Mr. Berenson.

41.    As a speech-protective statute, section 2168 supplements the rights guaranteed by the California Constitution. The California Supreme Court has interpreted "sections 2 and 3 of article I of the California Constitution [to] protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910, 592 P.2d 341, 347 (1979). In particular, the California Supreme Court noted that the shopping center was not "an individual homeowner or proprietor," but that "[a]s a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered" there. *Id.* at 911, 592 P.2d at 347. The Supreme Court later affirmed *Pruneyard* against a First Amendment challenge by the shopping center. *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980).

42.    *Pruneyard*'s logic, and the speech protections that case brings with it, extend to Twitter. As a publicly traded company with a market capitalization greater than $40 billion, Twitter is hardly "an individual homeowner or proprietor." The company induces hundreds of millions of people to use its platform daily. And unlike the shopping center in *Pruneyard*, Twitter's business model revolves around speech—around facilitating a global conversation.

43.    Extending *Pruneyard* to Twitter, or applying section 2168 to the company, would not violate the First Amendment. In *Pruneyard*, the Supreme Court rejected the shopping

center's argument "that a private property owner has a First Amendment right not to be forced by the State to use [its] property as a forum for the speech of others." *Pruneyard*, 447 U.S. at 85. Distinguishing the case from *Wooley v. Maynard*, 430 U.S. 705 (1977), in which the Supreme Court struck down New Hampshire's mandatory display of "Live Free or Die" on non-commercial license plates, the Court noted the shopping center "is not limited to personal use," but is rather "a business establishment that is open to the public to come and go as they please." *Pruneyard*, 477 U.S. at 87. As noted above, the same is true of Twitter.

44.     The *Pruneyard* Court further explained that "[t]he views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner." *Id.* The shopping center owner "can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." *Id.*; *see also Biden*, 141 S. Ct. at 1224 (Thomas, J., concurring) (noting "regulations that might affect speech are valid if they would have been permissible at the time of the founding," and that would be particularly true "where a restriction would not prohibit the company from speaking or force the company to endorse the speech"). Twitter is of course free to disavow speech on its platform and often does.

45.     Nor does the Dormant Commerce Clause provide Twitter with the ability to evade section 2168 or *Pruneyard*. The Dormant Commerce Clause "holds that any 'statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)).

46.     In *Rocky Mountain Farmers Union*, the Ninth Circuit upheld California's fuel standards against a Dormant Commerce Clause challenge, finding the standards were based "on

16

COMPLAINT

the harmful properties of fuel" and the standards "do[] not control the production or sale of ethanol wholly outside of California." *Id.* at 1104. "States may not mandate compliance with their preferred policies in wholly out-of-state transactions, but they are free to regulate commerce and contracts within their boundaries with the goal of influencing the out-of-state choices of market participants." *Id.* at 1103. Neither section 2168 nor the California Constitution regulate conduct outside of California since Twitter's censorship decisions emanate from its California headquarters.

**III.    Section 230 of the Communications Decency Act**

47.    Twenty-five years ago, Congress enacted the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (Feb. 8, 1996). Within that statute lies the Communications Decency Act of 1996 or CDA. The CDA is Title V of the Telecommunications Act of 1996 with the heading "Obscenity and Violence." 110 Stat. at 133. Section 230 of the CDA is in Subtitle A of Title VII, which Congress captioned "Obscene, Harassing, and Wrongful Utilization of Telecommunications Facilities," *id.*, tucked alongside requirements to scramble "sexually explicit adult programming," *id.* at 136. Congress placed section 230 of the CDA in section 509 of the Telecommunications Act of 1996 under the family-first heading "Online Family Empowerment." *Id.* at 137.

48.    As one of the architects of section 230 explained at the time, the Internet contains "some offensive material, some things in the bookstore, if you will, that our children ought not to see." 141 Cong. Rec. H8469 (statement by Rep. Cox). Noting that "the existing legal system provides a massive disincentive for the people who might best control the Internet to do so," *id.*, namely the litigation risk for some Internet platforms for policing any content at all, Representative Cox explained section 230 would "protect computer Good Samaritans . . . who

17

COMPLAINT

take steps to screen indecency and offensive materials for their customers," and "keep[] pornography away from our kids," *id.* at H8470. Then-Representative Wyden, section 230's co-sponsor, similarly argued that "parents and families are better suited to guard the portals of cyberspace and protect our children than our Government bureaucrats." *Id.*

49. Another supporter of section 230 noted that statute "allows parents to make important decisions with regard to what their children can access, not government." *Id.* at H8472 (statement by Rep. Goodlatte). Critically, Representative Goodlatte stated the law "doesn't violate free speech or the right of adults to communicate with each other." *Id.*

50. The operative provision of section 230 is subsection (c):

(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL

    (1) TREATMENT OF PUBLISHER OR SPEAKER
    No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

    (2) CIVIL LIABILITY
    No provider or user of an interactive computer service shall be held liable on account of--

        (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

        (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c).

51. Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.*

§ 230(e)(3). But elsewhere in the Telecommunications Act of 1996, Congress provided that "[t]his Act and the amendments made by this Act [(i.e., section 230)] shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." Telecommunications Act of 1996, § 601(c)(1), 110 Stat. at 143.

52.     Social media companies like Twitter contend that section 230 effectively nullifies speech-protective state laws, allowing the platforms to censor otherwise constitutionally protected speech. That is an odd outcome given Congress' focus on pornography in the CDA. Congress even explicitly found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Interposing section 230 to nullify California's common carrier statute and the free speech and petition guarantees of the California Constitution to facilitate censoring speech about matters of public concern undermines the very free expression Congress said it wanted to encourage, invading the sovereign prerogatives of the States at the same time.

53.     Courts have read section 230 to immunize Internet platforms from liability where plaintiffs sued them for their publishing decisions. *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009) (holding that section 230(c)(1) "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider"); *Fair Housing Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

54.     Plaintiffs in those cases did not raise the California common carrier statute, Cal. Civ. Code § 2168, or otherwise seek to treat the platforms as a common carrier as opposed to a "publisher or speaker" in section 230(c)(1)'s parlance. Tellingly, Congress addressed the applicability of common carriage principles to "interactive computer services" in section 502 of the CDA, 47 U.S.C. § 223, providing that "[n]othing in this section," which addressed obscene or harassing phone calls, "shall be construed to treat interactive computer services as common carriers or telecommunications carrier." 110 Stat at 135 (codified at 47 U.S.C. § 223(e)(6)). California's common carrier statute is not "in this section," i.e., the California law is not in 47 U.S.C. § 223. If Congress intended to bar treatment of platforms as common carriers, it could have explicitly done so, but did not, which is telling considering the history of common carriage regulation by the States. Lakier, *supra*, at 2320 (noting that "[d]ozens of states enacted [common carriage] statutes of this sort between 1848 and the early twentieth century"). If Congress had wanted to bar the possibility of applying these laws to the Internet, it did not do so with "exceedingly clear language," even though an expansive reading of section 230 would significantly alter the ability of States like California to govern themselves in this area. *Cf. United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020) ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property.").

55.     Moreover, section 230 does not categorically bar breach of contract, promissory estoppel, and least some commercial tort claims. *See Barnes*, 570 F.3d at 1109 (holding that "subsection 230(c)(1) . . . does not preclude" a claim "alleg[ing] breach of contract . . . under the theory of promissory estoppel"); *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946

F.3d 1040, 1054 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 13, 208 L. Ed. 2d 197 (2020) (holding that "immunity under [section 230] does not extend to anticompetitive conduct").

56.      Ultimately, an expansive, pro-censorship interpretation of section 230, particularly one that disregards speech-protective state laws, presents First Amendment challenges of its own. The First Amendment protects freedom of association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). In *Railway Employees Department v. Hanson*, 351 U.S. 225 (1956), the Supreme Court considered the interplay between a provision of the Nebraska Constitution which prohibited employers from "exclud[ing] persons from employment because of membership in or nonmembership in a labor organization" and a federal statute that empowered employers to "requir[e] all employees within a stated time to become a member of the labor organization." *Id.* at 228.

57.      From the employee's perspective, the Nebraska Constitution granted associational freedoms beyond those guaranteed by the First Amendment, namely associational freedoms enforceable against private employers. Even though "private rights" were at issue, the Supreme Court determined the case raised "justiciable questions" under the First Amendment because "[i]f private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded." *Id.* at 232. In this regard, the Supreme Court approvingly quoted the Supreme Court of Nebraska's observation that "[s]uch action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 states are concerned for without it such contracts could not be enforced

21

COMPLAINT

therein," *id.* (quoting *Hanson v. Union Pac. R. Co.*, 160 Neb. 669, 698, 71 N.W.2d 526, 547 (Neb. 1955)), before ultimately determining the federal statute did not violate the First Amendment, *id.* at 238.

58.     California's speech-protective laws and section 230 raise First Amendment issues under *Hanson*. Like the right to work provision in the Nebraska Constitution at issue in that case, both the California common carrier statute and the California Constitution provide more protection for speech than the First Amendment in the abstract because they grant rights against private parties. When an "interactive computer service" subject to these state laws censors speech in violation of those laws, it is "by force of" section 230, "a federal law which expressly declares that state law is superseded." *Id.* Federal law is the source of the private censorship, just like the federal statute in *Hanson* was the source of the limits on employee freedom of association, raising "justiciable questions" under the First Amendment.

59.     For independent journalist and best-selling author Alex Berenson, all this was largely academic until July 2021. As detailed below, during Mr. Berenson's decade-plus on Twitter the company largely lived up to its stated commitments to free speech, furnishing him a platform to report on numerous issues, including the COVID-19 pandemic. But then, this past summer, something changed. Despite the company's prior assurances, and just hours after the President of the United States accused social media platforms of "killing people" for not censoring speech about COVID-19 vaccines, the company locked Mr. Berenson out of his account. A month later, it permanently suspended him. How did it come to this?

///

///

**FACTUAL BACKGROUND**

**I.    Alex Berenson's Use of Twitter Before and During the Early Days of the COVID-19 Pandemic**

60.    Throughout his career, and like many other journalists, Mr. Berenson has used social media to amplify his reporting. Mr. Berenson joined Twitter in November 2009. The company verified his account in or around 2014, affixing a blue check mark to his account, a sign it was "authentic, notable, and active." Twitter, *About Verified Accounts*, https://help.twitter.com/en/managing-your-account/about-twitter-verified-accounts (last visited Dec. 19, 2021). As of January 2020, Mr. Berenson had approximately 7,000 Twitter followers, many of whom were drawn to his previous books and reporting.

61.    In January 2020, Mr. Berenson tweeted for the first time about COVID-19. In that tweet, he shared an article about SARS-CoV-2, the coronavirus that causes COVID-19, by *New York Times* columnist Nicholas Kristof. The tweet attracted one "like." At the time, much of the press did not appreciate that the COVID-19 pandemic would become, as NBC's Lester Holt put it later, "the story of my lifetime." *Ted Johnson, NBC News' Lester Holt On Reporting On The Coronavirus: "We've All Covered The Burning House, But This Time We're In The House" – Q&A*, Deadline (Mar. 18, 2020), https://deadline.com/2020/03/coronavirus-lester-holt-nbc-news-q-and-a-qa-1202886983/.

62.    Mr. Berenson dedicated much of his career to reporting on and breaking important news stories. Beginning in March 2020, his attention increasingly turned to COVID-19. This was as governments around the world, including state and local governments here in the United States, issued far-reaching, and in many ways unprecedented, lockdown orders as part of an effort "flatten the curve" of viral spread and transmission.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ENVISAGE LAW

63.     In late March 2020, Mr. Berenson reported on revised epidemiology models published by Professor Neil Ferguson of Imperial College London. In a six-tweet thread published on March 26, 2020, Mr. Berenson discussed Dr. Ferguson's revised mortality estimates, calling them a "remarkable turn" for an academic who had earlier forecast that 500,000 people would die from COVID-19 in the United Kingdom.

64.     Mr. Berenson's March 26 tweet was his first to go "viral." Industrialist and entrepreneur Elon Musk, among other prominent figures, retweeted Mr. Berenson's post. The thread's initial tweet, which is shown below, drew 7,468 likes, 3,743 retweets, and more than 4.6 million impressions. Twitter did not label this tweet false or misleading.



65.     In April 2020, Mr. Berenson continued covering epidemiological models. Specifically, he compared actual hospitalization data in New York and other jurisdictions against projections from the Institute for Health Metrics and Evaluation or IMHE. On April 6, *New York Times* White House correspondent Maggie Haberman noted Mr. Berenson's tweets "are making their way around the White House among some senior officials." Twitter did not label any of Mr. Berenson's reporting false or misleading.

66.     During the month of April 2020, Mr. Berenson's Twitter presence grew exponentially. He added more than 77,000 followers and his tweets from that month garnered

24

COMPLAINT

175 million impressions. As of the start of May, Mr. Berenson had increased his Twitter following by fourteen-fold from its early March 2020 mark, up from 7,000 to 84,000 followers.

67.     Mr. Berenson's reporting drew criticisms, with some calling for his voice to be silenced. At the same time, his work drew support from others across America and around the world who were suffering under lockdown policies.

## II.     Twitter's Evolving Approach to Medical Misinformation During the Early Days of the COVID-19 Pandemic

68.     In early March 2020, Twitter began to set out its approach to COVID-19. In a March 4, 2020 blog post, the company pledged its support for "[p]rotecting the conversation." The company explained that commitment as follows: "The power of a uniquely open service during a public health emergency is clear. The speed and borderless nature of Twitter presents an extraordinary opportunity to get the word out and ensure people have access to the latest information from expert sources around the world." Twitter Public Policy, *Stepping up our work to protect the public conversation around Covid-19*, (Mar. 4, 2020), https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.

69.     The company also expressed its desire to "help people find authoritative health information." *Id.* "With a critical mass of expert organizations, official government accounts, health professionals, and epidemiologists on our service," Twitter explained, "our goal is to elevate and amplify authoritative health information as far as possible." *Id.* Twitter did not define "authoritative health information" in the post.

70.     Twitter stated that it "put additional safeguards in place in order to facilitate the sharing of trusted public health information and to reduce potential harm to users," an effort largely focused on "advertisers [who might] opportunistically use the Covid-19 outbreak to

COMPLAINT

target inappropriate ads." *Id.* The company did not forecast censorship. While Twitter encouraged users to "[f]ollow @WHO [(the World Health Organization's Twitter account)] and your local health ministry" and "seek out authoritative health information," the company advised users to "ignore the noise." *Id.*

71.     In a separate blog post published on March 16, 2020, which the company updated twelve days later on April 1, Twitter unveiled its approach to content moderation. The company announced it was "[b]roadening our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information." @Vijaya & Matt Derella, *An update on our continuity strategy during COVID-19*, Twitter (Mar. 16, 2020, updated Apr. 1, 2020), https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.

72.     Again, the blog post did not elaborate on what the company considered to be "authoritative sources." Twitter stated it would "enforce this [policy] in close coordination with trusted *partners*, including public health authorities and *governments*, and continue to use and consult with information from those sources when reviewing content." *Id.* (emphasis added). Even so, the company explained it did not intend "to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise." *Id.* As of March 18, 2020, Twitter reported it had "removed more than 1,100 tweets containing misleading and potentially harmful content from Twitter." *Id.* At that point, Twitter had not labeled or removed any of Mr. Berenson's tweets.

73.     The post further identified eleven categories of information Twitter "will require people to remove." *Id.* The post targeted obvious falsehoods, including claims such as "the news about washing your hands is propaganda for soap companies, stop washing your hands." *Id.* For

other claims, as detailed below, Twitter distinguished between factual assertions, opinions, and specific calls to action or inaction to other Twitter users.

a.       Twitter called for censoring the "[d]enial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19," but required such statements be made "*with the intent to influence people into acting against recommended guidance.*" *Id.* (emphasis added). The company cited the claim "social distancing is not effective" as an example but tied that remark to "actively encouraging people to not socially distance themselves in areas known to be impacted by COVID-19 where such measures have been recommended by the relevant authorities." *Id.*

b.       Twitter stated it would take down discussion of "alleged cures" and "harmful treatments or protection measures" that "are known to be ineffective." *Id.* The company cited "use aromatherapy and essential oils to cure COVID-19" as a claim that could cause harm by inducing Twitter user to delay or forgo needed medical treatment. The other example, "drinking bleach and ingesting colloidal silver will cure COVID-19," was so obviously false that that the company noted such claims would be taken down "even if made in jest." Notably, Twitter said nothing about discussion or debate concerning clinical data, government information, or research articles regarding non-pharmaceutical interventions or vaccines, drugs, or other therapeutics.

c.       The company said it would censor "false or misleading information around COVID-19 diagnostic criteria or procedures," and "[f]alse or misleading claims on how to differentiate between COVID-19 and a different disease." Again, the company targeted content aimed at influencing behavior, which in turn could delay or keep an individual from seeking treatment, not discussion or debate about policy or issues.

COMPLAINT

74.    On May 11, 2020, Twitter announced further action on COVID-19 information. In another blog post, the company explained it "may use labels and warning messages to provide additional explanations or clarifications in situations." Yoel Roth & Nick Prickles, *Updating our approach to misleading information*, Twitter (May 11, 2020), https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.

75.    The company defined "three broad categories" of "false or misleading content":

- Misleading information — statements or assertions that have been confirmed to be false or misleading by subject-matter experts, such as public health authorities.

- Disputed claims — statements or assertions in which the accuracy, truthfulness, or credibility of the claim is contested or unknown.

- Unverified claims — information (which could be true or false) that is unconfirmed at the time it is shared.

*Id.* The company did not identify any of the "subject-matter experts" or "public health authorities" it considered to be "authoritative sources."

76.    Twitter explained that "disputed claims" and "misleading information" with a "moderate" risk of harm were subject to being labeled with a "link to a Twitter-curated page or external source containing additional information on the claims made within the Tweet." *Id.* The company gave the following as an example of labeled false content:

///

///

///

///

COMPLAINT



77.    Twitter explained that "misleading information" with a propensity to cause "severe" harm would be removed. *Id.* Meanwhile, a disputed claim that might cause severe harm would be labeled with a "warning." Twitter gave the following as an example:



78.    As with its previous COVID-19 policies, nowhere in the blog post did Twitter bar discussion or analysis of clinical data, government information, or research articles. In a contemporaneous news report on the policy, a Twitter official explained that "[p]eople don't

COMPLAINT

want us to play the role of deciding for them what's true and what's not true but they do not want people to play a much stronger role providing context." Amanda Seitz, *Twitter to label disputed COVID-19 tweets*, AP News, May 11, 2020, https://apnews.com/article/virus-outbreak-health-us-news-ap-top-news-technology-c8a542e2f22004c0c06cbbe1e1b58a52. To be clear, at least at this point, and viewed in the context of Twitter's prior instruction to its users to "ignore the noise," the company was plotting a course for more speech, not less.

**III.   With Twitter's full knowledge and personal assurances, Mr. Berenson continues to cover COVID-19 on Twitter, and his following grows.**

79.    Mr. Berenson covered COVID-19 throughout March, April, and May 2020. Among other things, during and after that time, Mr. Berenson used his Twitter account to repeatedly criticize universal masking policies, without regard for whether an individual is sick or well, as an effective COVID-19 preventative measure and other non-pharmaceutical interventions such as business and school closures.

80.    On the same day Twitter announced its new labeling policy, and though none of his tweets had been taken down or modified at the time, Mr. Berenson tweeted out his concern that the company was going to start censoring content. A few hours after Mr. Berenson's tweet, Twitter then-CEO Jack Dorsey followed his account. At that point, Twitter's leadership at the highest level was fully aware of Mr. Berenson's reporting.

81.    The same day Mr. Dorsey followed Mr. Berenson, Brandon Borrman, who then served as Twitter's Vice President of Global Communications, contacted Mr. Berenson about censorship issues. "I work at Twitter and saw your Tweets today," Mr. Borrman said. "Would you be open to having a discussion so I can hear you out? I think you have some nuanced points that could be helpful as [sic] try to move ahead."

82.    Mr. Berenson responded, acknowledging Twitter's legitimate interest in blocking claims "that the virus is not real, or that it's part of a UN conspiracy to sterilize America, or similar nonsense." Mr. Berenson summarized his approach to reporting on COVID-19 as follows:

> I am trying to raise serious, data-driven questions, based wherever possible on government data or peer-reviewed/preprint papers—I think my most recent tweets tonight capture the flavor. Does universal masking work as a broad policy mandate? The truth is the evidence is pretty weak—not that sick people shouldn't wear them, or maybe that people in confined public transportation (aka NY subways) shouldn't, but what states like NY and CA are saying and doing right now far outruns the evidence.

83.    Twitter's communications executive responded the following day. "We are trying to take a more nuanced approach to this that recognizes that there is a huge amount of emotion and vitriol [on] all sides of the issue," Mr. Borrman explained. "We're trying to make sure that factual debate finds a way through the emotion, but we're obviously not successful all the time."

84.    Mr. Borrman explained that "[t]he mask example was a poor one to use."[2] Appearing to draw on Twitter's prior policies which recognized a distinction between debate about policy and calls to violate specific laws, Mr. Borrman explained that

> We're less likely to take action on something regarding the efficacy of masks, and more likely to label something that, for example, directly calls on people to violate a local order to wear masks, regardless of their efficacy. In other words, we're trying to avoid appearing as though we're saying one treatment or solution is good or bad while still recognizing that, even if controversial, there are new laws in place in many locations. Debate over the effectiveness of those laws should continue, but encouragements to directly violate them cross a line.

___

[2] Upon information and belief, Mr. Borrman was referring to the statement in the above-cited Associated Press article that "[t]he company has been removing bogus coronavirus cures and claims that social distancing or face masks do not curb the virus' spread for several weeks." Seitz, *supra*.

COMPLAINT

As Mr. Borrman put it, Twitter is "leading with labeling here, rather than simply deciding between leave up/take down, because we think it will allow the conversation to continue." While the company "will be putting our thumbs on the scale with a label" where there are "pushes to violate local laws," Mr. Borrman said, "I don't expect that you will see major change in how we are addressing things going forward, but if you do, please feel free to reach out to me."

85.     In this e-mail exchange, Mr. Borrman did not raise specific concerns regarding Mr. Berenson's reporting. Instead, he advised Mr. Berenson there was no "major change" coming. While Mr. Berenson certainly criticized the laws Twitter's executive referred to in the e-mail, and reported on the underlying evidentiary basis for them, at no relevant time did he encourage individuals to break those laws.

86.     As a sophisticated commercial entity, Twitter employs counsel and Mr. Borrman had ample time and opportunity to seek out legal counsel to vet the statements and assurances the company made to Mr. Berenson. Upon information and belief, Mr. Borrman sought such counsel and made the statements in the May 12 e-mail message with the benefit of that counsel.

87.     Consistent with Mr. Borrman's assurances, Twitter's treatment of Mr. Berenson stayed the same. Aside from corresponding with Mr. Borrman regarding a "dox" threat, Mr. Berenson had no formal communication with the company. He had no reason to. Upon information and belief, Twitter did not label any of Mr. Berenson's tweets at any point in 2020.

88.     Relying on Twitter's assurances that no "major changes" in its moderation practices were upcoming, Mr. Berenson continued to build his Twitter following, spending hours each day on the platform bringing COVID-19 information to audience. Mr. Berenson invested this time in Twitter at the opportunity cost of investing his time in building a presence on

Telegram and Substack, two alternative platforms to Twitter available to him at the time, or writing books and articles for publication elsewhere.

89.     In June 2020, Mr. Berenson published his first "Unreported Truths" booklet on COVID-19 and lockdowns. After Amazon initially blocked the pamphlet's distribution on its platform, Mr. Berenson brought the issue to his Twitter followers. In what became a national news story, Elon Musk criticized Amazon for the decision, tweeting "[t]ime to break Amazon up." Todd Haselton, *Elon Musk calls for Amazon breakup after Covid-19 skeptic claims it censored his book*, CNBC (June 4, 2020), https://www.cnbc.com/2020/06/04/elon-musk-calls-for-amazon-split-after-alex-berenson-claims-censorship.html. Ultimately, because of this pressure, Amazon reversed course and let Mr. Berenson sell the pamphlets on its platform.

90.     Upon information and belief, Twitter was fully aware of Mr. Berenson's conflict with Amazon. The company was also aware of the content of Mr. Berenson's pamphlets, which presented data and analysis undermining the case for government lockdown measures. Mr. Berenson sold more than 300,000 copies of his "Unreported Truths" pamphlets, and he used to Twitter to generate much of the awareness of those works.

91.     Meanwhile, back on Twitter, Mr. Berenson continued to criticize government lockdowns and mask mandates. In an August 25, 2020 tweet, which is shown below, Mr. Berenson said that "lockdowns have provably failed" and "masks . . . are even more useless."



**Alex Berenson** ✔
@AlexBerenson

Follow ∨

Fact check: now that lockdowns have provably failed, the idiots who called for them (and were thankfully ignored) are trying to pretend that masks - which are even more useless - are the magic reason the Sunbelt wave turned into a driblet. Guess again.

COMPLAINT

This tweet received more than 1,250 likes and retweeted more than 350 times.

92.     Later, in November 2020, Mr. Berenson slammed not only lockdowns and mask mandates, but other non-pharmaceutical interventions such as contact tracing, saying advice from public health experts had "proven useless." That tweet, which garnered more than 4,700 likes and 1,000 retweets, is shown below.



Alex Berenson ✔
@AlexBerenson                    Follow   ⌄

1/ Allow me to explain this in terms even a public health expert can understand: NO ONE CARES WHAT YOU THINK ANYMORE. Your endless warnings of doom scare no one. Your advice has proven useless: masks, lockdowns, massive testing, contact tracing, none of it has worked...

93.     Twitter did not label any of these tweets, or any of Mr. Berenson's other similar tweets, as false or misleading. The company continued to allow Mr. Berenson to report freely and without interference. All of that was consistent with Twitter's specific, individualized prior assurances and representations via Mr. Borrman that "[d]ebate over the effectiveness of those laws should continue," and that Mr. Berenson would not "see major change in how we are addressing things going forward."

**IV.    With the advent of COVID-19 vaccines, Twitter announces new policies on misleading medical information, and the company gives further assurances to Mr. Berenson regarding his access to the platform.**

94.     On November 9, 2020, Pfizer and BioNTech announced positive clinical trial results regarding their COVID-19 vaccine. Far from being "anti-vax," having taken vaccines himself and allowing his children to be vaccinated, Mr. Berenson tweeted that while "more safety data" is needed, "this is legitimately good news," arguing that the emergence of a COVID-19 vaccine might offer a pathway out of the pandemic once and for all.

95.     One week later, on November 16, Moderna released results about its vaccine candidate. Mr. Berenson was again positive, tweeting that the development was "[m]ore good topline vaccine news," while linking to an article in the *Washington Post* with the headline "Moderna's coronavirus vaccine found to be nearly 95 percent effective in a preliminary analysis."

96.     The primary focus of Mr. Berenson's reporting throughout the rest of November and into early December 2020 continued to be other COVID-19 issues, and not vaccines. On December 11, Mr. Berenson tweeted about alleged political pressure related to FDA's authorization of the Pfizer-BioNTech COVID-19 vaccine. Three days later, on December 14, Mr. Berenson tweeted about an article published in *The New England Journal of Medicine* regarding the rate of occurrence of "severe adverse events" in a Pfizer-BioNTech vaccine trial.

97.     Two days later, Twitter announced a new policy regarding misleading COVID-19 vaccine information. Twitter Safety, *COVID-19: Our approach to misleading vaccine information*, Twitter (Dec. 16, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid19-vaccine. The company announced it would start to "remove Tweets which advance harmful or misleading narratives about COVID-19 vaccinations, including" the following:

- False claims that suggest immunizations and vaccines are used to intentionally cause harm to or control populations, including statements about vaccines that invoke a deliberate conspiracy;

- False claims which have been widely debunked about the adverse impacts or effects of receiving vaccinations; or

- False claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary.

35
COMPLAINT

*Id.* Twitter also stated "we may label or place a warning on Tweets that advance unsubstantiated rumors, disputed claims, as well as incomplete or out-of-context information." *Id.*

98.     The same day, Twitter also announced a larger "COVID-19 misleading information policy." *COVID-19 misleading information policy*, Twitter (Dec. 16, 2020), https://web.archive.org/web/20201216200114/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. The company stated that for content to violate the policy "it must" do the following: (1) "advance a claim of fact, expressed in definitive terms; (2) "be demonstrably false or misleading, based on widely available, authoritative sources"; and (3) "be likely to impact public safety or cause serious harm." *Id.*

99.     The policy set forth five categories of misleading information. The company said it "will label or remove false or misleading about," among other things, "official regulations, restrictions, or exemptions pertaining to health advisories," regarding "[p]ersonal protective equipment (PPE) such as claims about the efficacy and safety of face masks to reduce viral spread." *Id.*

100.     At the same time, Twitter said "[w]e seek to protect robust, public debate about the response to COVID-19, and recognize that the state of scientific knowledge about certain aspects of the pandemic and public response to it (including the development of vaccines) is still relatively nascent." *Id.* To that end, Twitter specifically stated that in the absence of other policy violations, the following are generally not in violation of this policy:

- **Strong commentary, opinions, and/or satire**, provided these do not contain false or misleading assertions of fact.

- **Counterspeech.** We allow for direct responses to misleading information which seek to undermine its impact by correcting the record, amplifying credible information, and educating the wider community about the prevalence and dynamics of misleading information.

36

COMPLAINT

- **Personal anecdotes or first-person accounts.**

- **Public debate about the advancement of COVID-19 science and research, including debate about research related to COVID-19**, such as the effectiveness of treatments and mitigation measures, so long as the claims don't misrepresent research findings.

*Id.*

101.    In the December 16 policy, Twitter also explained that "we are enforcing this policy *in close coordination with trusted partners*, including public health authorities, NGOs and *governments*, and continue to use and consult with information from those sources when reviewing content." *Id.* (emphasis added). Upon information and belief, Twitter's "trusted partners" include agencies of both state and federal governments.

102.    In view of these new policies, Mr. Berenson contacted Twitter executive Brandon Borrman on December 17, looking for assurances that Twitter would continue to allow his reporting on COVID-19 vaccines. Many "people [are] complaining I'm raising questions about the vaccine," Mr. Berenson wrote to Mr. Borrman. "So you know, there's no conspiracy theory nonsense," rather "[e]verything I point to about safety comes from the clinical trial data," and "my broader point is simply that we shouldn't be mandating this for adults."

103.    Mr. Borrman responded less than four hours later. "The points you're raising should not be an issue at all," Mr. Borrman assured Mr. Berenson. "The policy is designed to allow debate and discussion, but to discourage conspiracy theories, etc. Please let me know if you run into any issues."

104.    Mr. Berenson tweeted the e-mail exchange to his followers, and lauded Twitter's commitment to free speech. Given Twitter's assurances, Mr. Berenson continued covering COVID-19 on Twitter, again forgoing the opportunity to build his following and presence on alternative platforms such as Telegram and Substack. Upon information and belief, at the same

ENVISAGE LAW

time, Twitter continued to profit from Mr. Berenson's coverage of COVID-19 by monetizing his following through the sale of advertisements.

105.     Mr. Berenson kept on tweeting about mandatory mask policies and lockdowns. On January 28, 2021, Mr. Berenson criticized the media "for refusing to report the real-world evidence" that masks and lockdowns are "useless." Several weeks later, Mr. Berenson again called mask "useless." With respect to vaccines, Mr. Berenson raised questions about side effects and the long-term efficacy of the shots. Mr. Berenson often linked to primary and secondary source materials from which he was drawing these conclusions.

106.     Twitter did not label any of this reporting false or misleading. Nor did the company take any of the posts down. Given Twitter's personal assurances to him, Mr. Berenson had no reason to believe the company would take action against his account or keep him from reporting on Twitter.

**V.     Twitter introduces its new five-strike policy, reassures Mr. Berenson, and declines to "strike" any of his subsequent tweets.**

107.     On March 1, 2021, Twitter announced a new five-strike policy as part of the company's bar on medical misinformation. *COVID-19 misleading information policy*, Twitter (Mar. 1, 2021), https://web.archive.org/web/20210827062904/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. Accounts that committed "[r]epeated violations of this policy" are subject to increasing levels of discipline, up to and including permanent suspension for five or more violations. *Id.*

108.     In terms of the mechanics of the five-strike policy, "[t]weets that are labeled *and determined to be harmful* will accrue **1 strike**." *Id.* (emphasis added). Twitter takes no action for the first strike, but the company imposes a 12-hour-ban for second and third strikes. A fourth strike yields a one-week suspension with a fifth leading to permanent suspension. Twitter stated

that "[i]ndividuals will be notified directly when a label or required Tweet removal results in additional account-level enforcement." Twitter Safety, *Updates to our work on COVID-19 vaccine misinformation*, Twitter (Mar. 1, 2021), https://blog.twitter.com/en_us/topics/company/2021/updates-to-our-work-on-covid-19-vaccine-misinformation. In other words, instead of leaving account holders to guess, the company committed to giving users notice of the specific tweets violative of the policy.

109.    The day after Twitter announced the five-strike policy, Mr. Berenson again contacted the company, seeking assurances he could continue reporting on COVID-19 using the platform:

> Just following up on this in the wake of Twitter's announcement yesterday. I intend to continue to write about the vaccines—as always, with a heavy reliance on governmental data (whether from Israel, the US, or elsewhere) and published studies. I appreciate the fact that Twitter has allowed me to provide a risk-benefit analysis that people are generally not seeing elsewhere and I respect that you do not want conspiracy theories, etc, on the site. If your fact-checkers do have questions about something I've written, I hope you will let me know and give me a chance to respond to it before taking any action.

110.    Twitter responded the same day, and again the company assured Mr. Berenson that his work was not being targeted under Twitter's policies. "I will say that your name has never come up in the discussions around these policies," Mr. Borrman said. "If it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed. If something happens, please let me know."

111.    With Twitter's express encouragement, and reasonably believing he had no reason to fear censorship, Mr. Berenson kept building his Twitter following at the opportunity cost of time he could have spent on other platforms and activities. He also kept up his relentless, daily coverage of COVID-19 after Twitter's launch of the misleading information and five-strike policy, including the following:

COMPLAINT

ENVISAGE LAW

a.      On March 25, 2021, Mr. Berenson published his fourth *Unreported Truths* booklet, which he promoted on Twitter, and which contained much critical reporting on the COVID-19 vaccines;

b.      He tweeted that "masks are useless" on April 5 and that "civilian masks are useless" on May 8;

c.      On June 24, Mr. Berenson asked whether the CDC "is lying or just stupid?"; and

d.      On July 8, he published the below tweet regarding vaccines and the CDC.



**Alex Berenson** ✔
@AlexBerenson                          Follow

So @cdcgov is lying again. Just like it lied when it said myocarditis wasn't a risk. The data from Britain (AND here) are clear. Many fully vaccinated people are becoming severely ill and dying.

To say flatly that vaccines protect against "severe disease and death" is a lie.

Thursday, July 8, 2021

**Joint CDC and FDA Statement on Vaccine Boosters**
The United States is fortunate to have highly effective vaccines that are widely available for those aged 12 and up. People who are fully vaccinated are protected from severe disease and death, including from the variants currently circulating in the country such as Delta. People who are not vaccinated remain at risk. Virtually all COVID-19 hospitalizations and deaths are among those who are unvaccinated. We encourage Americans who have not yet been vaccinated to get vaccinated as soon as possible to protect themselves and their community. Americans who have been fully vaccinated do not need a booster shot at this time. FDA, CDC, and NIH are engaged in a science-based, rigorous process to consider whether or when a booster might be necessary. This process takes into account laboratory data, clinical trial data, and cohort data – which can include data from specific pharmaceutical companies, but does not rely on those data exclusively. We continue to review any new data as it becomes available and will keep the public informed. We are prepared for booster doses if and when the science demonstrates that they are needed.

7:30 PM - 8 Jul 2021

💬          🔁          ♡

112.    Twitter did not label any of these tweets. And since there was no label, the company did not count any of these tweets as a "strike" against Mr. Berenson's account under the five-strike policy.

113.     Nevertheless, Twitter did label some of Mr. Berenson's other tweets as misleading. In a March 15 tweet, Mr. Berenson argued that the vaccines on the traditional childhood vaccination schedule are "nothing like the mRNA/LNP biotechnology, which is more properly described as a gene therapy than a vaccine." Twitter labeled this opinion "misleading." As discussed further below, it was not.

114.     On May 29 and 30, Twitter labeled four separate tweets as "misleading." Two of tweets regarded Chinese-made COVID-19 vaccines. Another presented analysis of COVID-19 data from France and the United Kingdom. The fourth tweet dealt with a spike in COVID-19 deaths following a first vaccine dose. Finally, on July 8, Mr. Berenson tweeted a link to an article about issues related to transplanting organs from deceased patients "with vaccine-induced thrombosis and thrombocytopenia" which Twitter labeled "misleading."

115.     Mr. Berenson complained to Mr. Borrman about his company's labeling of the March 15 and May 30 tweets. Mr. Borrman stated he would look into the matter, but he did not respond further. Given Mr. Borrman's prior assurances and Twitter's subsequent silence, Mr. Berenson believed the labeling could have been attributable to the company's use of algorithms, which Twitter was still honing.

116.     Even with the inconsistent labeling, Mr. Berenson continued to utilize Twitter, mindful of the company's prior assurance that his name had "never come up in the discussions around these policies" as well as Mr. Borrman's promise to "try to ensure you're given a heads up before an action is taken." Importantly, none of Mr. Berenson's tweets up until that point had been labeled as a "strike" under the five-strike policy. At no time during this period did Twitter lock Mr. Berenson out of his account nor did Twitter take down or delete any of his tweets.

COMPLAINT

ENVISAGE LAW

117.    Under California law, "[a] waiver is an intentional relinquishment of a known right; may be expressed or implied; [and] any may be implied from conduct inferentially manifesting an intention to waive. *Salton Cmty. Servs. Dist. v. Southard*, 256 Cal. App. 2d 526, 532–33, 64 Cal. Rptr. 246, 251 (1967). By knowingly failing to flag these tweets, Twitter waived any claims that Mr. Berenson violated the five-strike policy based not only on those tweets, but any future similar statements.

**VI.    Hours after President Joe Biden says social media companies are "killing people," and after other key federal government officials call for social media companies to censor content, Twitter locks Mr. Berenson's account for the first time.**

118.    July 2021 marked the beginning of the end of Mr. Berenson's relationship with Twitter. On Saturday, July 10, Mr. Berenson participated in a panel discussion at a political convention in Dallas, Texas. During the session, Mr. Berenson commented on the government's failure to persuade Americans to take one of the available COVID-19 vaccines. The following day, Dr. Anthony Fauci, President Biden's Chief Medical Advisor, called Mr. Berenson's remarks "horrifying." According to Dr. Fauci, an official Mr. Berenson had criticized repeatedly throughout the COVID-19 pandemic, Mr. Berenson was "someone saying that it's a good thing for people not to try and save their lives." Olafimihan Oshin, *Fauci: 'Horrifying' to hear CPAC crowd cheering anti-vaccination remarks*, The Hill (July 11, 2021), https://thehill.com/homenews/sunday-talk-shows/562453-fauci-horrifying-to-hear-cpac-crowd-cheering-missed-vaccine-goal. Far from encouraging people on toward their deaths, Mr. Berenson was observing that many Americans, particularly younger Americans at demonstrably less risk of from COVID-19, had simply concluded that the risks of taking one of the COVID-19 vaccines outweighed the benefits.

119.    The government's rhetoric intensified as the week went on. A report called "The Disinformation Dozen," which identified twelve individuals said to "produce 65% of the shares of anti-vaccine misinformation on social media platforms," was featured in those efforts. Shannon Bond, *Just 12 People Are Behind Most Vaccine Hoaxes on Social Media, Research Shows*, NPR (May 14, 2021), https://www.npr.org/2021/05/13/996570855/disinformation-dozen-test-facebooks-twitters-ability-to-curb-vaccine-hoaxes. Many of the people on the list had a history of general anti-vaccine activism. Mr. Berenson was not included in this blacklist.

120.    On July 15, Surgeon General Vivek Murthy published a report titled "Confronting Health Misinformation." Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021), *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf. In the report, Surgeon General Murthy cited "The Disinformation Dozen" analysis. *Id.* at 6 n.45. He noted that "while there have been significant efforts to address health misinformation," citing Twitter's COVID-19 policy, *id.* at n.49, Surgeon General Murthy said "there is much more to be done." He explained "[t]he threat of misinformation raises important questions we must answer **together**." *Id.* (emphasis in original). In this regard, later in the report, he called for social media platforms to "[p]rioritize early detection of misinformation 'super-spreaders' and repeat offenders," and recommended the companies "[i]mpose clear consequences for accounts that repeatedly violate platform policies." *Id.* at 12.

121.    In a section of the report captioned "What Governments Can Do," Surgeon General Murthy recommended "invest[ing] in fact-checking and rumor control mechanisms where appropriate." *Id.* at 15. As authority for this recommendation, Surgeon General Murthy cited a report from the Virality Project. *See id.* at 15 n.62. According to that organization, "[t]he

43

COMPLAINT

Virality Project supports information exchange between public health officials, government, and social media platforms through weekly briefings and real-time incident response." *Virality Project Weekly Briefing #31 July 20, 2021 – July 27, 2021*, Virality Project, at 1, https://bit.ly/2YNp2e8. That outlet repeatedly criticized Mr. Berenson's reporting, at the very least providing a basis for government officials to become aware of Mr. Berenson and his reporting if they were not so acquainted previously, if not to identify him as a potential censorship target. *See, e.g.*, *id.* at 3 (calling Mr. Berenson "a frequent spreader of vaccine misinformation"); *Virality Project Weekly Briefing #22 May 18, 2021*, Virality Project, at 7, https://bit.ly/2YZufjg (linking to Mr. Berenson's "prominent anti-vaccine account").

122.    Asked about "actions that the federal government can take to ensure their [(social media companies')] cooperation," Press Secretary Psaki responded that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff." *Id.* Press Secretary Psaki revealed that the federal government was "flagging problematic posts for Facebook that spread disinformation." *Id.* Upon information and belief, in or around July 2021, the federal government also flagged "problematic posts" for Twitter, including posts by Mr. Berenson.

123.    Press Secretary Psaki explained that the federal government had "proposed changes . . . to social media platforms." *Id.* Among them, Ms. Psaki said the government "recommended—proposed that they [(the companies)] create a robust enforcement strategy that bridges their properties and provides transparency." *Id.* Ms. Psaki even suggested the companies work together so that people banned on one platform do not "remain active" on others. *Id.* She complained that the "disinformation dozen" in particular "remain active on Facebook, despite some even being banned on other platforms." *Id.*

COMPLAINT

124.     The following day, July 16, Ms. Psaki again called for social media companies to lock arms and "bridge their properties" because "[y]ou shouldn't be banned from one platform and not others if you—for providing misinformation out there." Press Briefing by Press Secretary Jen Psaki, July 16, 2021, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/. In other words, from the government's perspective, censorship on one platform should extend across the entire social media landscape. Ms. Psaki explained that the government is "in regular touch with social media platforms . . . about areas where have concern." *Id.* Upon information and belief, the "social media platforms" Ms. Psaki referred to included Twitter.

125.     Ms. Psaki further advised that "[a]ny decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies." *Id.* That is "their decision to do," Ms. Psaki explained. *Id.* "That is not the federal government doing that." *Id.* But echoing Dr. Fauci's statements five days earlier, she said "[i]t is life and death. It is a public health issue in the country." *Id.*

126.     Picking up on these themes, at around the same time of the White House press briefing, in response to a reporter who asked, "On COVID misinformation, what's your message to platforms like Facebook," President Biden said, "They're killing people." *President Biden: "They're killing people"*, C-SPAN, July 16, 2021, https://www.youtube.com/watch?v=gJoOtLn4goY. President Biden's statement caused other media to conclude that the government "blamed" social media companies "for spreading misinformation about the coronavirus and vaccines," creating "stalling U.S. vaccine rates." Lauren Egan, *'They're killing people': Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM EDT),

COMPLAINT

https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232. Tellingly and, upon information and belief, not coincidentally, Mr. Berenson's comments which Dr. Fauci attacked as "horrific" concerned the same subject— vaccine rates that had plateaued despite the government's efforts.

127.    Less than four hours after President Biden's comment and Press Secretary Psaki's briefing, Twitter locked Mr. Berenson's account for the first time. Under the five-strike policy, the lock was apparently his second strike, though the company did not inform him of the first strike. Despite prior assurances that the company would try to give Mr. Berenson a "heads up" before taking action, Twitter gave him no advance notice prior to locking his account. Upon information and belief, Twitter did not make any effort to notify Mr. Berenson.

128.    As for its part, the government kept pressing in. Four days after President Biden's comments, reports circulated that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." Matthew Brown, *'They should be held accountable': White House reviews platforms' misinformation liability*, USA Today, July 20, 2021, https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/. The report noted "[r]elations are tense between the Biden administration and social media platforms," and that the government was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.*

129.    Upon information and belief, in July 2021, the government encouraged Twitter to censor Mr. Berenson's account. Twitter says that it is "enforcing this policy *in close coordination with trusted partners*, including public health authorities, NGOs and *governments*,

and continue to use and consult with information from those sources when reviewing content."

*COVID-19 misleading information policy*, Twitter (Dec. 16, 2020),

https://web.archive.org/web/20201216200114/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy (emphasis added). Moreover, the government's threats

to take away section 230 protection on account of social media companies' failure to take

sufficient steps from the government's perspective to combat medical misinformation provided

additional pressure to censor.

130.    On September 7, Senator Elizabeth Warren appeared to commend Twitter for its

COVID-19 misinformation policy, and its decision to ban Mr. Berenson. In a letter to Amazon,

Senator Warren suggested that the bookseller apply a similar standard to COVID-19 information

in books and other materials available on that platform. Letter from Senator Elizabeth Warren to

Andy Jassy, Chief Executive Officer, Amazon, Inc., Sept. 7, 2021, at 5,

https://www.warren.senate.gov/imo/media/doc/2021.9.7%20Letter%20to%20Amazon%20on%20COVID%20Misinformation.pdf. In this regard, Senator Warren noted that Twitter "recently

ban[ned] Alex Berenson—whose books appear prominently in Amazon searches—from its

platform." *Id.*

131.    "The Supreme Court has articulated four tests for determining whether a private

individual's actions amount to state action: (1) the public function test; (2) the joint action test;

(3) the state compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d

423, 444-45 (9th Cir. 2002). Twitter's censorship of Mr. Berenson constitutes state action under

at least the joint action and governmental nexus tests.

COMPLAINT

**VII.  Twitter permanently suspends Mr. Berenson, violating its rules and breaking its prior promises in the process.**

132.    Twitter's Terms of Service (the "Terms") are one of several documents that purport to govern the legal relationship between the company and account holders. Twitter Terms of Service, https://twitter.com/en/tos (updated August 19, 2021).[3] Individual account owners have no ability to comment, revise, or even to propose revisions to the Terms. The Terms are a contract of adhesion. California law requires such contracts to be construed against the drafter, which in this case is Twitter. *See City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 397, 181 P.3d 142, 158 (2008) (referring to the "special construction rules" that apply to adhesion contracts such as construing terms against the drafter).

133.    The Terms provide that the company "may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies." *Id.* As described further below, Twitter did not cite this passage to justify banning Mr. Berenson from its platform.

134.    Also relevant here, the Terms contain no merger or integration clause. The Terms contain no bar on modification by course of conduct or from trade usage. Under California law, "[t]he terms may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Civ. Proc. Code § 1856(c).

135.    Twitter gave Mr. Berenson no personal notice of his suspension or any explanation as to why he was suspended. Instead, Mr. Berenson learned through media reports

---

[3] Twitter modified the Terms on June 18, 2020 and January 1, 2020, but those modifications have no bearing on this dispute.

that Twitter's permanent suspension of his account was not based on any violation of the Terms. As the company informed NBC, Fox News, and other media outlets, Mr. Berenson was "permanently suspended for repeated violations of our COVID-19 misinformation rules." Michael Ruiz, *Twitter permanently suspends Alex Berenson over coronavirus tweets*, Fox Business, Aug. 28, 2021, https://www.foxbusiness.com/media/twitter-permanently-suspends-alex-berenson-over-coronavirus-tweets.

136.    Twitter's COVID-19 misinformation rules provide a definite, objective standard. The operative medical information policy provides that "for content related to COVID-19 to be labeled or removed under this policy," which is also the predicate for an account incurring a "strike," the content "must" do the following: (1) "advance a claim of fact, expressed in definitive terms; (2) "be demonstrably false or misleading, based on widely available, authoritative sources"; and (3) "be likely to impact public safety or cause serious harm." The five-strike system itself uses the phrase "we will" to describe the policy. The policy contains no reservation of rights to permanently suspend an account or bar a user from the platform for "any or no reason" as the Terms purport to do. Further, the policy was issued after the operative Terms governing Mr. Berenson and Twitter's relationship. To suspend Mr. Berenson from the platform on the basis that he violated these rules, then he must have objectively violated the rules. Mr. Berenson did not do so.

137.    To this day, Mr. Berenson is unaware which tweet was his first strike. His second strike, which coincided with President Biden's charge that social media companies were "killing people," was for the following tweet:

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ENVISAGE LAW



In the tweet, Mr. Berenson linked to another user's analysis of COVID-19 case counts in countries with high vaccination rates

138.     The tweet did not violate Twitter's policy, for at least five reasons. First, Twitter never labeled the underlying, linked-to tweet as "misleading," the only factual content in Mr. Berenson's tweet.[4] Second, two days prior to strike two, Twitter took no action when Mr. Berenson tweeted his opinion that "the vaccines are failing," which was based on data that "[t]he UK, the most vaccinated major country in the world, reported 42,000 cases" of COVID-19, a "100x" increase from the previous year. Third, Mr. Berenson tweeted his opinion, and the policy expressly provides for protection of opinion. Fourth, Mr. Berenson's reporting in this tweet was much like the reporting Twitter was previously aware of and did not object to. Fifth, despite the company's previous assurances that it would try to give Mr. Berenson a "heads up" prior to acting, Twitter gave him no notice prior to applying the strike.

---

[4] To this day, the underlying tweet is still not labeled. *See* Corona Realism (@holmenkollin), Twitter (July 16, 2021, 6:59 AM), https://twitter.com/holmenkollin/status/1415989536933490688.

139.    On July 27, Twitter locked Mr. Berenson's account for twelve hours again, his third strike on the platform. The company did not identify the tweet that allegedly violated the Twitter policy. Again, Twitter did not give Mr. Berenson notice prior to locking his account.

140.    Twitter gave Mr. Berenson his fourth strike on July 30 based on the following:



141.    This tweet was true, and not false or misleading. Mr. Berenson cited a pre-print, non-peer-reviewed review of six month safety efficacy data for the Pfizer-BioNTech COVID-19 vaccine. Stephen J. Thomas et al., *Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine*, July 28, 2021, https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1.full.pdf. The report noted that "[d]uring the blinded, controlled period, 15 BNT162b2 and 14 placebo recipients died." *Id.* at 6. With this, Mr. Berenson was pointing out that this data showed there was no significant difference in overall mortality between patients who received the Pfizer-BioNTech COVID-19 vaccine and the placebo. To be clear, his comment was not about whether the vaccine studied prevented patients from contracting COVID-19 or whether patients who took the vaccine had

51

ENVISAGE LAW

less severe cases of the disease. It was an evidence-based interpretation of overall mortality data and nothing more than that.

142.     Mr. Berenson's reference to the "trial blind" referred to the fact that Pfizer gave patients in the placebo arm of the clinical trial a COVID-19 vaccine after the product received emergency use authorization. As a result, it would not be possible to track long-term overall mortality between the two groups from the original trial without a comparator placebo group. This is what Mr. Berenson meant when he tweeted that the "trial blind is broken now."

143.     Critiquing or otherwise questioning clinical trial design, particularly the circumstances around breaking trial blinds, could hardly be considered controversial or damaging to the public. In a 1998 guidance document, FDA noted that "[b]reaking the blind (for a single subject) should be considered only when knowledge of the treatment assignment is deemed essential by the subject's physician for the subject's care." FDA, *Guidance for Industry, E9 Statistical Principles for Clinical Trials*, at 12 1998), *available at* https://www.fda.gov/media/71336/download.

144.     A month later, during the evening of August 28, Twitter issued its fifth strike against Mr. Berenson, permanently suspending his account. The company did not cite the specific tweet that formed the basis of the fifth strike. Upon information and belief, the tweet below, which the company labeled misleading, served as Twitter's basis for the fifth strike and Mr. Berenson's permanent suspension from the platform.

///

///

///

ENVISAGE LAW

**Alex Berenson** ✓ @AlexB... · 8/28/21 ···
It doesn't stop infection.
Or transmission.

Don't think of it as a vaccine.

Think of it - at best - as a therapeutic
with a limited window of efficacy and
terrible side effect profile that must be
dosed IN ADVANCE OF ILLNESS.

And we want to mandate it?
Insanity.

ⓣ Learn why health officials
recommend a vaccine for most       ›
people.

145.    Like the other strikes, this tweet also did not violate Twitter's stated policy. Mr. Berenson's claim that the COVID-19 vaccines do not "stop infection" or "transmission" of COVID-19 was true at the time and is true now. It is undisputed that vaccinated persons can contract and spread COVID-19. On July 30, Dr. Anthony Fauci confirmed that "individuals who are infected through breakthrough infections, namely vaccinated people who ultimately get infected, that they are generally without symptoms or minimally symptomatic, however it is clear that they are capable of transmitting the infection to uninfected individuals." *Dr. Fauci on COVID-19 Spread*, Yahoo Finance, July 31, 2021, https://youtu.be/mP9iHyj1uiU.

146.    Dr. Fauci's July 30 observation remains true today. In a December 2021 editorial in *The New England Journal of Medicine*, Dr. Fauci and two other medical doctors explained that "[a]s important as [the COVID-19 vaccines] are, however, their protective efficacy wanes over time, necessitating booster doses," and that "[v]accination has also been unable to prevent 'breakthrough' infections, allowing subsequent transmission to other people even when the vaccine prevents severe and fatal disease." David M. Morens, Jeffery K. Taubenberger, M.D., Ph.D., and Anthony S. Fauci, *Universal Coronavirus Vaccines—An Urgent Need*, New Engl. J.

COMPLAINT

Med., Dec. 15, 2021, https://www.nejm.org/doi/full/10.1056/NEJMp2118468. If anything, this article corroborates Mr. Berenson's allegedly ban-worthy tweet, rather than contradict it.

147.    What is more, Twitter amended its COVID-19 misinformation policy in December 2021. On or around December 10, Twitter announced that it would label claims "that people who received the vaccine can spread or shed the virus (or symptoms or immunity) to unvaccinated people." Twitter, *COVID-19 misleading information policy*, Dec. 10, 2021, https://web.archive.org/web/20211210152757/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. That change, made more than three months after Mr. Berenson's August 28 tweet, would have arguably brought his prior statement within the scope of the policy. But then Twitter reversed course. On December 16, the day after *The New England of Journal Medicine* article was published, Twitter revised its policy to say it would label claims that "people who have received the vaccine can spread or shed the vaccine (or symptoms, or immunity)" as opposed to the virus. Twitter, *COVID-19 misleading information policy*, Dec. 16, 2021, https://web.archive.org/web/20211216085837/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. What that means is that, even today, Mr. Berenson's allegedly ban-worthy claim that the COVID-19 vaccines do not stop infection or transmission does not violate Twitter's policy.

148.    *Snopes* reported that "[a]ccording to the company, the use of the word 'virus' in that context," i.e., in the December 10 iteration of the policy, "was merely a typo, which was corrected on Dec. 16, and did not reflect the true policy anyway." Dan MacGuill, *Did Twitter Prohibit Making an Accurate Claim About COVID-19 Transmission?*, Snopes, Dec. 16, 2021, https://www.snopes.com/fact-check/twitter-ban-covid-vaccine/.  The *Snopes* article quotes a Twitter spokesperson as follows:

The earlier language is *not reflective of our enforcement approach*, *past* or present. We've enforced our COVID-19 misleading information policy in line with the corrected language only. *We do not take enforcement action against claims that people who receive the vaccine can spread or shed the virus.*

*Id.* (emphasis added). And yet, in Mr. Berenson's case, contrary to this claim, Twitter took action against his August 28 tweet, including his assertion that the vaccines do not stop transmission of COVID-19.

149.     With respect to the rest of the tweet, Mr. Berenson's recommendation not to think of the COVID-19 vaccines "as a vaccine" turns on the definition of that term. Even though the company could have done so, Twitter's policy does not define the term, so outside sources must be consulted. In a glossary on its website, the CDC defines the term in relevant part as a "suspension of live (usually attenuated) or inactivated microorganisms (e.g. bacteria or viruses) or fractions thereof administered to *induce immunity and prevent infectious diseases* and their sequelae." CDC, *Vaccines & Immunizations, Glossary*,

https://www.cdc.gov/vaccines/terms/glossary.html (last updated July 30, 2020) (emphasis added). Similarly, FDA explains on its website that "[v]accines work by mimicking the infectious bacteria or viruses that cause disease. Vaccination stimulates the body's immune system to build up defenses against the infectious bacteria or virus (organism) *without causing the disease.*" FDA, *Vaccine Development – 101*, Dec. 14, 2020, https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/vaccine-development-101 (emphasis added). Courts have similarly defined the term. *See, e.g.*, *Dean v. Sec'y of Health & Hum. Servs.*, No. 16-1245V, 2018 WL 3104388, at *9 (Fed. Cl. May 29, 2018) (defining "vaccine" to be "any substance designed to be administered to a human being for the prevention of 1 or more diseases") (quoting 26 U.S.C. § 4132(a)(2)). Finally, California's Sherman Food, Drug, and Cosmetic Law contains two references to the term "vaccine," with the one relevant reference

55

COMPLAINT

relating the term to preventing infection. *See* Cal. Health & Safety Code § 111605 (defining "AIDS-related drug" to include a "vaccine to protect against human immunodeficiency virus (HIV) infection").

150.   Set against this backdrop, it was not false or misleading for Mr. Berenson to claim that the available COVID-19 vaccines are not "vaccines" in the traditional sense, but rather "therapeutics with a limited efficacy window." Further, Mr. Berenson's characterizations of the side effect profile of the vaccines were at very least protected opinions under the terms of Twitter's policy as were his critiques of vaccine mandates.

151.   Twitter gave no notice to Mr. Berenson prior to issuing its fifth strike and permanent suspension from the platform. Again, this was contrary to the prior representations made to him by a company executive. The company also denied Mr. Berenson's appeal to be reinstated to the platform. Further, the tweets that precipitated his suspension from Twitter, the five strikes, were all substantially similar in content and tone to tweets he made in the past with Twitter's knowledge, consent, and apparent approval. Again, Twitter executive Brandon Borrman assured Mr. Berenson, even after he started to tweet about the vaccines, that "your name has never come up in the discussions around these policies."

152.   Recall that to violate Twitter's COVID-19 misinformation policy, a tweet "must," in addition to being "demonstrably false or misleading, based on widely available, authoritative sources," also "be likely to impact public safety or cause serious harm." Upon information and belief, Twitter has no direct evidence that any of the purported five strikes against Mr. Berenson's account affected public safety or caused serious harm.

153.   Mr. Berenson did not violate Twitter's COVID-19 rules. As such, requiring Twitter to carry his messages does not raise compelled speech problems under the First

Amendment, because the company would not be required to broadcast messages with which it disagrees—i.e., messages that violate the company's rules.

154.    In the months leading up to his suspension from the platform, Mr. Berenson's Twitter following continued to grow. Just before he was suspended, Mr. Berenson claimed 345,000 followers, a nearly fifty-fold increase over his following from March 2020. In the two months prior to his suspension from Twitter, his tweets received 180 and 182 million views, respectively, while his Twitter profile was viewed 19.5 and 25 million times during the same time period. Upon information and belief, at all relevant times, to include during July and August 2021, Twitter profited from Mr. Berenson's reporting on the platform.

155.    Twitter itself competes against Mr. Berenson for an audience regarding COVID-19. Twitter also profits from use of its platform by other media outlets, to include outlets and journalists that compete against Mr. Berenson. With respect to COVID-19, the company acknowledges that "[m]ore people than ever are coming to Twitter to learn about COVID-19." To capitalize on this audience, Twitter explained it is rolling out "experimental settings [to] give newsrooms and journalists over the conversations they start." Twitter, *COVID-19 news coverage on Twitter*, https://media.twitter.com/en/articles/best-practice/2020/covid-19-news-coverage-on-twitter (last visited Dec. 19, 2021). The page itself features NBC, Reuters, CBS, and CNN among others.

156.    Twitter's branding of Mr. Berenson as a spreader of "misinformation" along with the company's complete censorship of his speech provides itself and media outlets the company services with a competitive advantage over Mr. Berenson. Twitter profits not only from the traffic generated by these competitive outlets, but from any ancillary services adjacent to its platform it might be able to sell. At the same time, Twitter's censorship of Mr. Berenson garners

the company favor from powerful governmental actors, including the current Administration and members of Congress.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE FIRST AMENDMENT
**Free Speech Clause**
**Petition Clause**
**U.S. Const. Amend. I**

157.    Mr. Berenson re-alleges the preceding paragraphs herein.

158.    In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court created an implied cause of action for violations of the Fourth Amendment.

159.    The Ninth Circuit has recognized the applicability of *Bivens* to certain First Amendment claims. *See Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986) ("We now follow these circuits in holding that, because plaintiffs have alleged that FBI agents acted with the impermissible motive of curbing . . . protected speech, they have asserted a claim properly cognizable through a *Bivens*-type action directly under the First Amendment.").

160.    Twitter deprived Mr. Berenson of the right to speak on its platform.

161.    At the same time, Twitter deprived Mr. Berenson of the right to petition the federal government for a redress of grievances by tweeting to and interacting with accounts run and managed by the federal government, including @POTUS.

162.    As outlined in detail above, Twitter deprived Mr. Berenson of these rights as part of its "partnership" with the federal government. Upon information and belief, the federal government enticed and coerced Twitter to deprive Mr. Berenson of his right to speak and petition the federal government on the platform.

163.    Twitter's actions in this case constitute state action under the U.S. Constitution.

58

COMPLAINT

164.     Twitter's wholesale censorship of Mr. Berenson's speech and petition rights

violates the First Amendment and is actionable as a *Bivens* claim.

## COUNT II
## FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION
Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B)

165.     Mr. Berenson re-alleges the preceding paragraphs herein.

166.     Twitter made false and misleading representations concerning Mr. Berenson's

professional activities in commerce, namely, his reporting on COVID-19, including without

limitation the following:

 a.     That Mr. Berenson committed "repeated violations" of Twitter's COVID-

19 misinformation policies;

 b.     That Mr. Berenson's tweets regarding Chinese-made COVID-19 vaccines

were misleading;

 c.     That Mr. Berenson's tweet regarding the Pfizer-BioNTech COVID-19

vaccine trial was false or misleading;

 d.     That a tweet from Mr. Berenson regarding an increase in COVID-19

deaths following a first vaccine dose was misleading; and

 e.     That Mr. Berenson's tweet linking to an article about issues related to

transplanting organs from deceased patients "with vaccine-induced thrombosis and

thrombocytopenia" was misleading.

167.     Twitter's false and misleading representations regarding Mr. Berenson have

actually deceived and are likely to deceive consumers regarding Mr. Berenson's reporting

services and cause them to refrain from reading Mr. Berenson's reporting and/or purchasing his

books or pamphlets. At the same time, Twitter's actions make it more likely these consumers get

news from other sources approved by Twitter, to the company's direct and indirect economic benefit.

168.    Twitter's false and misleading representations regarding Mr. Berenson were disseminated in interstate commerce and were made in connection with commercial advertising and/or promotion of Twitter as a source for information concerning COVID-19.

169.    Mr. Berenson's interests in this case fall within the zone of interests protected by the Lanham Act. Twitter's false and misleading representations regarding Mr. Berenson harm his ability to retain and expand his readership and audience, including the relevant market for his reporting and for his books and pamphlets.

170.    These harms suffered by Mr. Berenson are the proximate result of Twitter's false and misleading representations.

171.    This claim concerns Twitter's own statements. Even so, "immunity under [section 230] does not extend to anticompetitive conduct." *Enigma Software*, 946 F.3d at 1054. To the extent Twitter's false and misleading representations conferred a competitive advantage on itself and Mr. Berenson's journalistic competitors, the company cannot claim the benefit of section 230 immunity.

**COUNT III**
**VIOLATION OF CALIFORNIA COMMON CARRIER LAW**
**Cal. Civ. Code §§ 2168, 2169, 2209**

172.    Mr. Berenson re-alleges the preceding paragraphs herein.

173.    Under California law, "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168. In California, "a common carrier must, if able to do

so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." *Id.* § 2169.

174.    Further, "[e]very person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual damages, and fifty dollars in addition thereto." *Id.* § 2209.

175.    Twitter offers to the public to carry "messages" on its platform.

176.    Twitter is not a telegraphic message service.

177.    Twitter's Terms provide that "[t]he of the State of California, excluding its choice of law provisions, will govern . . . any dispute that arises" between a user and the company.

178.    Twitter has refused and currently refuses to carry Mr. Berenson's messages. The company denied his appeal to be reinstated to the platform.

179.    Mr. Berenson has incurred damages by Twitter's refusal, including but not limited to on account of not being to publish his reporting, promote his booklets and new book, and sell subscriptions to his Substack account.

180.    Twitter's refusal to carry Mr. Berenson's messages violates at least sections 2169 and 2209 of the California Civil Code.

181.    California's common carrier law protects speech against private censorship.

182.    To the extent section 230 applies to the California common carrier law, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

183.    Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

COMPLAINT

184. Using section 230, a federal statute, to nullify the California common carrier statute to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

185. Requiring Twitter to carry Mr. Berenson's messages would not violate the company's First Amendment rights. Mr. Berenson did not violate Twitter's Terms or its rules. As a result, application of section 2168 to Twitter would not require the company to carry speech that violates its policies.

## COUNT IV
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Professions Code §§ 17200 et seq.

186. Mr. Berenson re-alleges the preceding paragraphs herein.

187. The California Unfair Competition Law (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]." Cal. Bus. & Prof. Code § 17200.

188. At a minimum, the following actions by Twitter against Mr. Berenson were unfair, deceptive, and untrue with respect to Mr. Berenson:

    a. The statement that Mr. Berenson committed "repeated violations" of Twitter's COVID-19 misinformation policies;

    b. Labeling Mr. Berenson's tweets regarding Chinese-made COVID-19 vaccines as misleading;

    c. Labeling Mr. Berenson's tweet regarding the Pfizer-BioNTech COVID-19 vaccine trial as false or misleading;

    d. Labeling Mr. Berenson tweet regarding an increase in COVID-19 deaths following a first vaccine dose as misleading; and

e.    Labeling Mr. Berenson's tweet linking to an article about issues related to transplanting organs from deceased patients "with vaccine-induced thrombosis and thrombocytopenia" as misleading.

189.    Further, to the extent Twitter maintains that the COVID-19 misinformation rules are not to be objectively read and applied, and that the company can label content regardless of what its rules say, then such is also unfair, deceptive, and untrue.

190.    "An unlawful business practice under [UCL] section 17200 is 'an act or practice, committed pursuant to business activity, that is at the same time forbidden by law.'"  *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1383, 108 Cal. Rptr. 3d 669, 677 (2010) (citing *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 287, 37 Cal. Rptr. 3d 434, 453 (2005)).  Provided the conduct at issue "is at the time forbidden by law," then "[v]irtually any law—federal, state or local—can serve as a predicate for an action under" the UCL.  *Id.*

191.    To have standing under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322, 246 P.3d 877, 885 (2011).

192.    At a minimum, Twitter's refusal to carry Mr. Berenson's messages constitutes a violation of the California common carrier law. Mr. Berenson has suffered a specific economic injury on account of Twitter's violation of that statute, including but not limited to an account of not being able to publish his reporting, promote his booklets and new book, and sell subscriptions to his Substack account.

193.    To the extent section 230 applies to the UCL, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

194.    Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

195.    Using section 230, a federal statute, to nullify the UCL to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

196.    Moreover, "immunity under [section 230] does not extend to anticompetitive conduct." *Enigma Software*, 946 F.3d at 1054. To the extent Twitter's censorship conferred a competitive advantage on itself and Mr. Berenson's journalistic competitors, the company cannot claim the benefit of section 230 immunity.

197.    Further, though section 230(e)(2), which provides that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property," has been read to apply only to limited federal intellectual property claims in the Ninth Circuit, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), the Third Circuit recently held that the provision "applies to state intellectual property law," *Hepp v. Facebook*, 14 F.4th 404, 212 (3d Cir. 2021). *Hepp* reflects the Supreme Court's commitment to textualism, *see Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1737 (2020) ("Only the written word is law, and all persons are entitled to its benefits."), and should be applied here to find Mr. Berenson's UCL outside the scope of section 230, because unfair competition is a subspecies of intellectual property law.

## COUNT V
## BREACH OF CONTRACT

198.    Mr. Berenson re-alleges the preceding paragraphs herein.

199.     The Terms and Twitter's rules, to include the COVID-19 medical information policy, constitute a binding contract between Twitter and Mr. Berenson.

200.     The contract between Twitter and Mr. Berenson is a contract of adhesion under California law.

201.     Since Twitter is the drafter of the terms of the contract between it and Mr. Berenson, the terms should be construed against the company.

202.     Twitter amended its Terms by promulgating its COVID-19 five-strike policy.

203.     Twitter's rules committed the company to a specific five-strike policy under which content must meet certain defined, objective criteria to be deemed violative. The company is bound to apply that policy objectively and rationally under California's duty of good faith and fair dealing which requires, among other things, "each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818, 620 P.2d 141 (1979).

204.     As set forth above, the content Mr. Berenson published did not violate any of Twitter's rules, as defined.

205.     Twitter breached its contract with Mr. Berenson by permanently suspending his account on the basis that he violated the company's COVID-19 misinformation rules.

206.     Mr. Berenson incurred damages on account of Twitter's breach of the contract.

207.     Twitter's breach of contract was intentional and willful.

208.     Since Twitter is a common carrier and its actions against Mr. Berenson were at least willful, the liability waiver the company unilaterally included in its Terms is unenforceable since a "common carrier cannot be exonerated, by any agreement made in anticipation thereof,

from liability for the gross negligence, fraud, or willful wrong of himself or his servants." Cal.

Civ. Code § 2175.

### COUNT VI
### PROMISSORY ESTOPPEL

209.    Mr. Berenson re-alleges the preceding paragraphs herein.

210.    Twitter made unambiguous, personal promises and assurances to Mr. Berenson

over the course of more than a year, including but not limited to the following:

a.    That Mr. Berenson was raising "nuanced points" about the COVID-19

pandemic and the response to the same;

b.    That Twitter was taking a "nuanced approach" to discussion around

COVID-19;

c.    That Twitter was "trying to make sure that factual debate finds a way

through the emotion";

d.    That Twitter was "trying to avoid appearing as though we're saying one

treatment or solution [to COVID-19] is good or bad";

e.    That Twitter is "leading with labeling here, rather than simply deciding

between leave up/take down";

f.    That Twitter did not "expect that you will see major change in how we are

addressing things going forward";

g.    That the points Mr. Berenson was raising about COVID-19 vaccines in

and around December 2020 "should not be an issue at all";

h.    That, as of March 2021, Mr. Berenson's "name has never come up in the

discussions around these policies"; and

66

COMPLAINT

i.     That Twitter would "try to ensure you're given a heads up before an action is taken" against Mr. Berenson's account.

211.     These specific, personal promises amplified the general promises contained in the five-strike policy under which Twitter purported to permanently ban Mr. Berenson. California courts have held vaguer and more open-ended statements than those Twitter made to Mr. Berenson sufficiently definite to support a promissory estoppel claim. *See Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1045–46, 107 Cal. Rptr. 3d 683, 696 (2010) (surveying cases where courts found various statements to be sufficiently definite, including a "promise to use 'best efforts to acquire land sufficient to support promissory estoppel" and "borrowers promise that 'if' he obtained earthquake insurance, lender would be loss payee").

212.     Further, Twitter had specific knowledge of Mr. Berenson's tweets, and did not object to them. Instead, the company enticed Mr. Berenson to continue using its service.

213.     Mr. Berenson relied on Twitter's promises and assurances by continuing to use the platform.

214.     Mr. Berenson's reliance was reasonable and foreseeable.

215.     Mr. Berenson was injured by his reliance by continuing to build his following on Twitter as opposed to investing time and attention on other available platforms such as Telegram and Substack.

**COUNT VII**
**VIOLATION OF CALIFORNIA CONSTITUTION**
**Free Speech Clause**
**Petition Clause**
**Cal. Const. art. I, §§ 2, 3**

216.     Mr. Berenson re-alleges the preceding paragraphs herein.

COMPLAINT

217.    The California Supreme Court has interpreted "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910, 592 P.2d 341, 347 (1979).

218.    Like the shopping center in *PruneYard*, Twitter is held open to the public. Further, unlike the shopping center in that case, Twitter's express purpose is to facilitate speech and communication about issues.

219.    The rule in *Pruneyard* has not yet been extended to social media companies, but the logic of the case warrants application to Twitter.

220.    Under *Pruneyard*, and if extended, Twitter's censorship of Mr. Berenson's speech violates the California State Constitution.

221.    To the extent section 230 applies to the California Constitution, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

222.    Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

223.    Using section 230, a federal statute, to nullify the California Constitution to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

## COUNT VIII
## UNJUST ENRICHMENT

224.    Mr. Berenson re-alleges the preceding paragraphs herein.

225.    Twitter claims that it banned Mr. Berenson for repeatedly violating the platform's medical misinformation rules.

ENVISAGE LAW

226.    According to Twitter, for at least a certain time period, Mr. Berenson used Twitter in violation of the company's policies, and Twitter profited in the process.

227.    Any profits traceable to Mr. Berenson's reporting are a benefit conferred on Twitter that it should not have received.

228.    Mr. Berenson is entitled to restitution from Twitter.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Berenson respectfully prays that this Court:

A.    Enter an injunction requiring Twitter to comply with California's common carrier statute, the UCL, its contractual obligations, and the promises the company made to Mr. Berenson by requiring Twitter to carry Mr. Berenson's messages as it does other members of the public;

B.    Enjoin Twitter from violating Mr. Berenson's rights under the federal Lanham Act and the California and U.S. Constitutions;

C.    Award Mr. Berenson damages under the federal Lanham Act, the California common carrier law, and the UCL;

D.    Award Mr. Berenson damages for breach of contract;

E.    Award Mr. Berenson reliance damages for promissory estoppel;

F.    Disgorge Twitter of its ill-gotten gains attributable to Mr. Berenson's use of Twitter; and

G.    Award any other relief to Mr. Berenson which this Court deems necessary and proper.

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR TRIAL BY JURY**

Mr. Berenson requests a jury trial on all issues so triable.

Respectfully submitted, this 20th day of December 2021.

ENVISAGE LAW

By:     _/s/ James R. Lawrence, III_
          James R. Lawrence, III*
          Anthony J. Biller*
          * *pro hac vice* pending

CHARIS LEX P.C.

By:     _/s/ Sean P. Gates_
          Sean P. Gates

*Attorneys for Plaintiff Alex Berenson*

COMPLAINT