JAMES R. LAWRENCE, III (NC Bar No. 44560)*
jlawrence@envisage.law
ANTHONY J. BILLER (NC Bar No. 24117)*
ajbiller@envisage.law
ENVISAGE LAW
2601 Oberlin Road, Suite 100
Raleigh, North Carolina 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
*admitted *pro hac vice*

SEAN P. GATES (SBN 186247)
sgates@charislex.com
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730

*Attorneys for Plaintiff Alex Berenson*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALEX BERENSON,**<br><br>   **Plaintiff,**<br><br>   **v.**<br><br>**TWITTER, INC.,**<br><br>   **Defendant.** | Case No.: 3:21-cv-09818-WHA<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO TWITTER, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Hearing Date: April 28, 2022, 8:00 AM<br><br>Judge: William H. Alsup |

ENVISAGE LAW

**Alex Berenson's Reponse to Twitter's Motion to Dismiss Case No. 3:21-CV-09818-WHA**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    Mr. Berenson pled a plausible claim that Twitter behaved as a state actor. (Count I) .... 2

II.   Twitter's censorship of Mr. Berenson violates California's Constitution. (Count VII) .. 7

III.  California's common carrier law applies to Twitter. (Count IV) ................................... 10

IV.   Mr. Berenson has a viable Lanham Act claim. (Count II) ............................................. 11

V.    Twitter violated California's Unfair Competition Law. (Count IV) ............................. 13

VI.   Mr. Berenson's complaint states a claim for breach of contract. (Count V) ................ 14

VII.  Mr. Berenson has a viable promissory estoppel claim. (Count VI) .............................. 17

      A.    Twitter's promises were sufficiently definite. ...................................................... 17

      B.    Mr. Berenson's reliance on Twitter's promises was reasonable........................... 20

VIII. Mr. Berenson's unjust enrichment claim is viable. (Count VIII) ................................. 22

IX.   The First Amendment does not prohibit Mr. Berenson's claims.................................... 23

X.    The Communications Decency Act does not bar Mr. Berenson's claims. ..................... 23

CONCLUSION................................................................................................................ 25

ENVISAGE LAW

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

1

### TABLE OF AUTHORITIES

2

**Cases**

3    *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106 (2003) ............................................................ 7

4    *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, 2013 WL 2351814 (S.D. Cal. 2013).... 15, 16

5    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ 2, 5

6    *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009).................................................. 20, 21, 34

7    *Carreras v. City of Anaheim*, 768 F.2d 1039 (9th Cir. 1985) ........................................................ 7

8    *Children's Health Defense v. Facebook Inc.*, 546 F. Supp. 3d 909 (N.D. Cal. 2021).................. 6

9    *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375 (2008) .................................. 16

10   *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) ............... 12

11   *Coles v. Glaser*, 2 Cal. App. 5th 384 (2016)............................................................................ 14

12   *Cranston/BVT Assocs., Ltd. P'ship v. Sleepy's, LLC*,

     2015 WL 5793693 (D.R.I. Sept. 30, 2015)............................................................................ 19

13   *Daniels v. Alphabet Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ................................ 6, 16

14   *Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150 (2016) ........................ 20, 21

15   *Darnaa, LLC v. Google, Inc.*, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) ............................ 24

16   *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774 (N.D. Cal. 2016) .......................................... 10

17   *Doe v. Uber Techs., Inc.*, 2019 WL 6251189 (N.D. Cal. Nov. 22, 2019) .................................. 10

18   *Domen v. ViMeo*, 433 Supp. 3d 592 (S.D.N.Y. 2020)................................................................ 9

19   *Ebeid v. Facebook, Inc.*, 2019 WL 2059662 (N.D. Cal. May 9, 2019) .................................... 16

20   *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019) .......... 24

21   *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,

22   521 F.3d 1157 (9th Cir. 2008) .............................................................................................. 24

23   *Fashion Valley Mall, LLC v. Nat'l Lab. Rels. Bd.*, 42 Cal. 4th 850 (2007)................................... 8

24   *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387 (N.D. Cal. 2017).......................................... 22

25   *Foster v. Reverse Mortg. Sols., Inc.*, 2020 WL 4390374 (C.D. Cal. May 13, 2020)................... 22

26   *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011)............................................... 13

27   *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031 (2010)....................................................... 17

28

iii

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

ENVISAGE LAW

*Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 492 (2000)................................................. 7

*Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal. 4th 1013 (2001) ........ 8

*Granadino v. Wells Fargo Bank, N.A.*, 236 Cal. App. 4th 411 (2015)........................................ 20

*Herrick v. Grindr, LLC,* 306 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................... 20

*hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d, 1099 (N.D. Cal. 2017) ............................... 9

*Huang v. The Bicycle Casino, Inc.*, 4 Cal. App. 5th 329 (2016) ............................................... 10

*Laguna Publ'g Co. v. Golden Rain Found.*, 131 Cal. App. 3d 816 (Ct. App. 1982) ............... 7, 8

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ........................................... 9, 11

*Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12 (2021) ................................................. 16, 17, 20

*NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) ................................ 11

*O'Handley v. Padilla*, 2022 WL 93625 (N.D. Cal. Jan. 10, 2022)....................................... 6, 11

*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018 (N.D. Cal. 2014)............................................ 23

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 77 (1980)............................................... 8, 9

*Railway Employees Department v. Hanson*, 351 U.S. 225 (1956)...................................... 24, 25

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) .................................................... 11

*Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979).................................... 7, 8, 9

*Sheen v. Wells Fargo Bank, N.A.*, 2022 WL 664722 (2022) ................................................. 21

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)............................... 11

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ..................................................................... 5, 6

*Sweet v. Google Inc.*, 2018 WL 1184777 (N.D. Cal. Mar. 7, 2018)...................................... 16

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .................................................... 5

*Twitter, Inc. v. Paxton*, 2022 WL 610352 (9th Cir. Mar. 2, 2022) .................................. 1, 11, 23

*US Ecology, Inc. v. State of California*, 92 Cal. App. 4th 113, 136 (2001)........................ 18, 19

*Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379 (1989) ........................... 15, 17

*Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215 (N.D. Cal. 2011)............................................ 16

*Zierolf v. Wachovia Mortg.*, 2012 WL 6161352 (N.D. Cal. Dec. 11, 2012) ............................. 20

**Statutes**

47 U.S.C. § 230...................................................................................................................... 23

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

**ENVISAGE LAW**

Cal. Civ. Code § 2089.............................................................................................. 10

Cal. Civ. Code § 2168.............................................................................................. 10

Cal. Civ. Code § 2175.............................................................................................. 16

**Other Authorities**

Brian Hiatt, *Twitter CEO Jack Dorsey: The Rolling Stone Interview*,

   Rolling Stone, Jan. 23, 2019.................................................................................. 7

Chandelis Duster, *US surgeon general on tech companies' steps to fight Covid misinformation:*

   *'It's not enough'*, CNN, July 18, 2021................................................................... 4

*Jack Dorsey: Twitter users consider it a public square*, CNBC, Sept. 5, 2018 ........................... 7

Jessica Bursztynsky, *White House says social media networks should be held accountable for*

   *spreading misinformation*, CNBC, July 20, 2021.................................................... 4

President of Russia, Twitter............................................................................................. 1

Yoel Roth & Nick Prickles, Updating our approach to misleading information, Twitter

   (May 11, 2020)........................................................................................................ 18

Zabihullah Mujahid, Spokesman of the Islamic Emirate of Afghanistan,Twitter ....................... 1

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

**ENVISAGE LAW**

## ISSUES TO BE DECIDED

1.      Whether Plaintiff Alex Berenson's complaint states claims for relief.

2.      Whether Mr. Berenson's claims are barred by the First Amendment.

3.      Whether Mr. Berenson's claims are barred by section 230 of the Communications Decency Act of 1996.

## MEMORANDUM OF POINTS OF AUTHORITY

Twitter presents itself as a worldwide platform for journalism and free speech, offering everyone from Vladimir Putin to the Taliban access to its hundreds of millions of users. It allows Putin's Kremlin to tweet propaganda—and a sitting United States Senator to call for Putin's assassination.[1] Yet despite explicit promises, and a year-long course of conduct creating reliance, Twitter banned journalist Alex Berenson from reporting on COVID-19 or any other subject.

According to Twitter, our country's laws offer Mr. Berenson no protection, regardless of the company's policies and repeated statements to him. But as the Ninth Circuit recently observed though, Twitter's statements are subject to legal scrutiny like "any other business," *Twitter, Inc. v. Paxton*, 2022 WL 610352, at *5 (9th Cir. Mar. 2, 2022). Twitter's apparent belief the First Amendment shields the company's conduct is mistaken. After all, as the *Paxton* court noted, a business cannot stop an antitrust investigation by asserting a First Amendment right to discuss price fixing. *Id.* at *4. Nor does section 230 of the Communications Decency Act allow Twitter to avoid accountability for its actions. Twitter's motion to dismiss should be denied.

## FACTUAL BACKGROUND

In 2020, independent journalist Alex Berenson emerged as a prominent critic of the public policy response to the COVID-19 pandemic, and he used Twitter as the primary outlet for his work. (*Id.* ¶¶ 1, 4.) From 2020 to 2021, Mr. Berenson gained 300,000 followers. (*Id.* ¶ 154.)

---

[1] *See* Zabihullah Mujahid, Spokesman of the Islamic Emirate of Afghanistan,Twitter, https://twitter.com/Zabehulah_M33; President of Russia, Twitter, https://twitter.com/KremlinRussia_E; Ariel Zilber, *Why Twitter won't remove Lindsey Graham's tweet about assassinating Putin*, NY Post, Mar. 8, 2022, https://nypost.com/2022/03/08/twitter-wont-remove-lindsey-graham-tweet-about-assassinating-putin/.

**Alex Berenson's Reponse to Twitter's Motion to Dismiss Case No. 3:21-CV-09818-WHA**

Mr. Berenson's reporting drew criticism, with some calling for his voice to be silenced. (*Id.* ¶ 67.) Twitter did not act on these calls for censorship, at least at first, even as the company's approach to COVID-19 evolved. As the company substantively changed its approach, Twitter gave Mr. Berenson personal assurances regarding his reporting on the platform. In May 2020, a Twitter executive told Mr. Berenson that "[d]ebate over the effectiveness of [COVID-19 laws] *should continue*," (*id.* ¶ 84 (emphasis added)), and that he should not expect "major change in how we are addressing things going forward," (*id.* ¶ 85). Later, in December 2020, after the company tightened its policies about statements on COVID-19 vaccines, a Twitter executive told Mr. Berenson his reporting on the vaccines "should not be an issue at all." (*Id.* ¶ 103). In March 2021, as Twitter tightened its rules yet again, the executive personally reassured Mr. Berenson a third time that his "name has never come up in discussions around these policies." (*Id.* ¶ 110.)

Trusting Twitter's assurances, Mr. Berenson continued building his following, and kept reporting without any outright censorship until July 2021. That is when, after an intense week of scrutiny by senior federal government officials, and literally hours after President Biden told reporters social media companies were "killing people" because they had not done enough to censor speech about the COVID-19 vaccines, Twitter locked Mr. Berenson out of his account for the first time. (*Id.* ¶ 127.) Six weeks later, Twitter permanently suspended him for "repeated violations of our COVID-19 misinformation rules." (*Id.* ¶ 135.) To this day, the company has not articulated how Mr. Berenson's reporting was "misinformation" or otherwise violated Twitter's speech code.

## ARGUMENT

### I.   Mr. Berenson pled a plausible claim that Twitter behaved as a state actor. (Count I)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

1  defendant is liable." *Id.* This is not a "'probability requirement,' but it asks for more than a sheer

2  possibility that a defendant has acted unlawfully." *Id.*

3      Mr. Berenson pled a plausible state actor claim against Twitter. Mr. Berenson's theory is

4  not that Twitter itself is a state actor in isolation, but rather that it acted in concert with the

5  government when it permanently suspended him, depriving him of his most powerful venue to

6  speak and petition the government. In this regard, Mr. Berenson described the evolution of

7  Twitter's policies on COVID-19 information, and how the company's approach at first centered

8  on giving users "context" as opposed to engaging in outright censorship, (*id.* ¶ 79), with only

9  statements "with a propensity" to create severe harm being subject to removal, (*id.* ¶ 77). Mr.

10 Berenson pled how, three separate times when Twitter amended its policies, he received personal

11 assurances from a Twitter executive about his reporting. *First*, in May 2020, the executive said

12 Mr. Berenson was raising "nuanced points," (*id.* ¶ 80), that "we're trying to avoid appearing as

13 though we're saying one treatment or solution is good or bad, (*id.* ¶ 84), and that "[d]ebate over

14 the effectiveness of [COVID-19 laws] *should continue*," (*id.* (emphasis added.) *Second*, in

15 December 2020, after Twitter further amended its COVID-19 misleading-information policy,

16 Twitter told Mr. Berenson's reporting on COVID-19 vaccines "should not be an issue at all," and

17 that "[t]he policy is designed to allow debate and discussion, but to discourage conspiracy

18 theories, etc." (*Id.* ¶ 103.) *Third*, in March 2021, after Twitter launched its new five-strike policy,

19 the Twitter executive told Mr. Berenson that his "name has never come up in discussions around

20 these policies," and that "I will try to ensure you're given a heads up before action is taken." (*Id.*

21 ¶ 110.) Outside of Twitter applying labels to certain tweets, (*id.* ¶¶ 113-114), the company did

22 not lock him out of his account or delete his tweets, (*id.* ¶ 116), even as his audience grew.

23      It was only after a week in July 2021 in which key government officials, including

24 President Biden, heaped criticism on social media companies that Twitter censored Mr.

25 Berenson. (*Id.* ¶ 127.) The week kicked off with President Biden's Chief Medical Advisor, Dr.

26 Anthony Fauci, calling Mr. Berenson's remarks about vaccine hesitancy "horrifying." (*Id.*

27 ¶ 118.) It continued with Surgeon General Vivek Murthy releasing a report called "The

28

ENVISAGE LAW

3

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

Disinformation Dozen," which cited sources critical of Mr. Berenson's reporting on COVID-19 vaccines. (*Id.* ¶¶ 120-21.) Press Secretary Jennifer Psaki echoed these concerns in two separate press conferences, (*id.* ¶¶ 122-24), and President Biden told the press social media companies were "killing people" by not censoring content, (*id.* ¶ 126).

In addition, the current Administration was "assessing whether social media platforms are legally liable for misinformation spread on their platforms," threatening to amend section 230 of the Communications Decency Act. (*Id.* ¶ 128.) On July 20, White House Communications Director Kate Bedingfield went even further, saying social media platforms "should certainly be held accountable," noting President Biden has spoken "very aggressively" about the issue."[2]

But Mr. Berenson is not just pointing to these officials' "public statements . . . decrying the spread of COVID-19 misinformation" as Twitter suggests. (D.27 at 13:14-15.) Instead, Mr. Berenson alleges that these officials were specifically aware of him, in Dr. Fauci's case, or at least had a reason to be aware of him, in Dr. Murthy's. Dr. Murthy and other senior officials also repeatedly acknowledged having privately met with Twitter executives to discourage the company from promoting vaccine "misinformation." In a July 18 CNN interview, Dr. Murthy said he had spoken with "a number of [social media companies] over the last many months, and my team has as well." Chandelis Duster, *US surgeon general on tech companies' steps to fight Covid misinformation: 'It's not enough'*, CNN, July 18, 2021, https://www.cnn.com/2021/07/18/politics/vivek-murthy-surgeon-general-social-media-misinformation-cnntv/index.html.

Mr. Berenson also alleges that Twitter's treatment of him changed dramatically during this week in July 2021, concluding with his first-ever suspension from the platform. (D.1 ¶ 127.) Given the government's awareness of his reporting, Twitter's statements about working "in close

---

[2] Jessica Bursztynsky, *White House says social media networks should be held accountable for spreading misinformation*, CNBC, July 20, 2021, https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html. Ms. Bedingfield also raised section 230 reform as a possibility. *Id.*

coordination" with governments, the acknowledgment that government officials had spoken privately to Twitter, and the abrupt change in Mr. Berenson's relationship with the platform, he alleged, "upon information and belief," that his ban came at the government's behest. (*Id.* ¶ 129.)

"If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In such a case, provided there is no "obvious alternative explanation," a "[p]laintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Id.* (italics in original).

Here, Mr. Berenson alleges sufficient facts from which to conclude that the government and Twitter "acted in concert in effecting a particular deprivation of constitutional rights," *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012), namely his First Amendment rights to speak and petition the government. At the least, the facts alleged give rise to a plausible claim that Twitter was "a willful participant in joint action" with the government or that the government "knowingly accepted the benefits derived from the unconstitutional behavior." *Id.* As late as March 2021, following months of Mr. Berenson's aggressive but factually accurate reporting around COVID-19 vaccine side effects and related issues, Twitter told Mr. Berenson that his "name has *never* come up in discussions around" its COVID-19 policies. (D.1 ¶ 110 (emphasis added).) In a week's time, Twitter went from allowing Mr. Berenson unrestricted access to its platform, to censoring his account, and then a few weeks later to banning him.

What changed? If the "obvious alternative explanation" for the ban is that Mr. Berenson suddenly began to violate Twitter's COVID-19 misinformation policy after more than a year of using the platform to Twitter's own stated satisfaction, (D.27 at 9:18), then Twitter's motion does not explain how or why that is the case. If the policy offers a "plausible" alternative explanation, Twitter presents this rationale in threadbare terms, *cf. Iqbal*, 556 U.S. at 678 (noting that "[t]hreadbare recitals" of a claim "mere conclusory statements, do not suffice" to survive a

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

1    motion to dismiss), but it is not "obvious" or "convincing that [Mr. Berenson's] explanation is *im*

2    plausible," *Starr*, 652 F.3d at 1216.[3]

3            The cases Twitter cites lack both the changes in the platforms' position on content and

4    the personal assurances present here. There is no indication Twitter ever told the plaintiff in

5    *O'Handley v. Padilla*, 2022 WL 93625 (N.D. Cal. Jan. 10, 2022), that his tweeting on election-

6    related issues "should not be a problem," or that his name has "never come up in discussions

7    around these policies." *See id.* at *4-5 (describing Twitter's enforcement history). Nor is there

8    any indication that YouTube gave similar assurances to the plaintiff in *Daniels v. Alphabet Inc.*,

9    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021). *See id.* at *2-3 (describing the plaintiff's content

10   and posts).

11           The government's activity in those cases is also distinguishable from this case. In

12   *O'Handley*, an official in a California agency with no apparent regulatory oversight over Twitter

13   "flagg[ed] a single O'Handley tweet," and "did not direct or even request that Twitter take any

14   particular action in response to the tweet." *O'Handley*, 2022 WL 93625, at *9. The plaintiff in

15   *Daniels* cited statements from members of Congress, none which targeted him or provided a

16   basis to infer the same. *Daniels*, 2021 WL 1222166, at *3-4. Twitter also cites *Children's Health*

17   *Defense v. Facebook Inc.*, 546 F. Supp. 3d 909 (N.D. Cal. 2021) (on appeal), but like *Daniels*,

18   the plaintiff in that case did not allege facts sufficient to infer that the government was targeting

19   it. By contrast, here, Mr. Berenson has alleged facts sufficient to conclude that high-ranking

20   federal officials were aware of his reporting, that the White House was looking to hold Twitter

21   and other social media companies legally accountable for so-called "misinformation," and

22   Twitter's treatment of him changed dramatically almost immediately thereafter.

23   _____

24   [3] Twitter's discussion of Mr. Berenson's allegedly ban-worthy tweets consists of one sentence.
     (D.27 at 11:18-22.) Two of the statements feature opinions regarding the COVID-19 vaccines.

25   (*Id.* at 11:19-22.) For the other statement, Twitter says Mr. Berenson "stated that Pfizer's vaccine
     'does nothing to reduce the overall risk of death.'" (*Id.* at 11:18.) Twitter's curation of Mr.

26   Berenson's reporting is misleading. He was accurately reporting on the results from the "pivotal
     clinical trial" for the Pfizer vaccine, not stating his own opinion, as is apparent from reading the

27   tweet in context. (*See* D.1 ¶ 140.)

28

**Alex Berenson's Reponse to**
                                                        **Twitter's Motion to Dismiss**
                                                        **Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

**II.     Twitter's censorship of Mr. Berenson violates California's Constitution. (Count VII)**

The California Constitution's guarantee of free speech "runs against the world, including private parties as well as governmental actors." *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 492 (2000). The California courts have extended free speech protections to individuals in private shopping malls, *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979), and even within the confines of gated communities, *Laguna Publ'g Co. v. Golden Rain Found.*, 131 Cal. App. 3d 816, 841 (Ct. App. 1982), *disapproved of by on other grounds Katzberg v. Regents of Univ. of California*, 29 Cal. 4th 300 (2002); *see also Carreras v. City of Anaheim*, 768 F.2d 1039, 1045 (9th Cir. 1985) ("Under California law, however, even a privately owned facility that is open to the public is subject to the requirements of the public forum doctrine."). "Whether private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly depends in part on the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants." *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 119 (2003).

Twitter satisfies the test of being a "quasi-public property" subject to the California Constitution. Regarding its "nature, purpose, and primary use," the company's own mission statement includes "defending and respecting the user's voice" as one of Twitter's "core values." (D.1. ¶ 1.) Former Twitter CEO Jack Dorsey even testified under oath before Congress that "we [(i.e., Twitter)] believe the people use Twitter as they would a public square." *Jack Dorsey: Twitter users consider it a public square*, CNBC, Sept. 5, 2018, https://www.cnbc.com/video/2018/09/05/jack-dorsey-twitter-users-consider-it-a-public-square.html. Early in 2019, Mr. Dorsey likewise said, "People see Twitter as a public square, and therefore they have expectations that they would have of a public square." Brian Hiatt, *Twitter CEO Jack Dorsey: The Rolling Stone Interview*, Rolling Stone, Jan. 23, 2019, https://www.rollingstone.com/culture/culture-features/twitter-ceo-jack-dorsey-rolling-stone-interview-782298/amp/. The company's platform is open to the public, even more so than the

7

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

ENVISAGE LAW

shopping center in *Pruneyard*. *Compare Pruneyard*, 23 Cal. 3d at 911 (noting "25,000 persons are induced to congregate daily" in the shopping center), *with* (D.1 ¶ 23 (noting Twitter's 192 million average monetizable daily active users)).[4] Speech is core to Twitter's mission. If California's Constitution applies to distributing a newspaper inside a gated community with private security, *Laguna Publ'g*, 131 Cal. App. 3d at 825, then it applies here.

Twitter cites *Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal. 4th 1013 (2001), a case which did not extend *Pruneyard* to a tenants association that wanted to "distribute its newsletter in a privately owned apartment complex." *Id.* at 1016. But the private apartment complex in that case flatly prohibited solicitation. *Id.* at 1018. The *Golden Gateway* court distinguished that case from *Laguna Publishing* because "the instant case does not involve a discriminatory limitation on speech activities." *Id.* at 1035. The California Supreme Court struck down content-based speech restrictions, finding that a mall could impose time-place-and-manner rules on speakers to ensure they "do not interfere with the normal business operations of the mall, but they may not prohibit certain types of speech based on its content." *Fashion Valley Mall, LLC v. Nat'l Lab. Rels. Bd.*, 42 Cal. 4th 850, 870 (2007). Here, Twitter engaged in textbook viewpoint discrimination when it banned Mr. Berenson based on his reporting. The company acknowledges as much in its motion when it says the company "does not want to disseminate" Mr. Berenson's speech. (D.27 at 9:18-19.)

Twitter tries to distinguish itself from the shopping center in *Pruneyard*, arguing that venue "broadly replaced other traditional fora, like the downtown core of San Jose." (D.27 at 16:23.) But that logic applies even more strongly to Twitter, which has arguably displaced the

---

[4] Twitter says it does not extend an "open and *unrestricted* invitation to the public" because of its terms and conditions. (D.27 at 16:16.) The shopping center in *Pruneyard* had "a policy not to permit any visitor or tenant to engage in any publicly expressive activity, including the circulation of petitions, that is not directly related to its commercial purposes." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 77 (1980). The gated community in *Laguna Publishing* limited access to "authorized persons" who had to pass "private security guards." *Laguna Publ'g*, 131 Cal. App. 3d at 822. Regardless, Twitter says "it is an *open service*." (D.1 ¶ 37 (emphasis added).)

1   town square in the Internet age. Twitter also says it is just "one of many alternative fora" for

2   speech. (*Id.* at 16:25.) Twitter is too humble. Twitter is not just one forum among many, but

3   rather the second largest social media network in the world, with hundreds of millions of users.

4   (*See* D.1 ¶¶ 23-25.) If speech protection in California "runs against the world," it does not

5   disappear into the ether at Twitter's login screen.

6          The two district court decisions Twitter cites which declined to apply *Pruneyard* to social

7   media companies are not controlling and mistaken in view of the precedents cited above. The

8   cases are also distinguishable, since they involved different services, namely LinkedIn, a "site

9   focused on business and professional networking," *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F.

10  Supp. 3d, 1099, 1103 (N.D. Cal. 2017), and ViMeo, "an online forum that allows users to

11  upload, view, share, and comment on videos," *Domen v. ViMeo*, 433 Supp. 3d 592, 597

12  (S.D.N.Y. 2020) (international quotation marks omitted). Neither service is predicated on speech

13  like Twitter. Further, while the *hiQ Labs* court did not extend *Pruneyard*, the decision was at the

14  preliminary injunction stage, with the court noting that the plaintiff had not "*at this juncture*

15  raised 'serious questions' that LinkedIn's conduct violates . . . the California Constitution." *hiQ*

16  *Labs*, 273 F. Supp. 3d at 1117 (emphasis added).

17         Twitter's assertion that applying *Pruneyard* to it would violate the First Amendment

18  lacks merit. In *Pruneyard*, the Supreme Court rejected the shopping center's argument that "a

19  private property owner has a First Amendment right not to be forced by the State to use his

20  property as a forum for the speech of others." *Pruneyard*, 447 U.S. at 86. The Court

21  distinguished *Pruneyard* from *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974),

22  noting the latter case "rests on the principle that the State cannot tell a newspaper what it must

23  print." *Pruneyard*, 447 at U.S. at 88. In *Miami Herald*, the Court was also concerned that the

24  statute at issue "would dampen the vigor and limit the variety of public debate by deterring

25  editors from publishing controversial political statements that might trigger the application of the

26  statute." *Id.* (internal quotations and alterations omitted). In Mr. Berenson's case, applying the

27

28

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

speech protections in the California Constitution to Twitter would do the opposite, creating more debate on critical public issues, not less.

### III.   California's common carrier law applies to Twitter. (Count IV)

In California, "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168. Twitter carries message on behalf of hundreds of millions of people each day. (D.1 ¶ 37.) The company's services fit within section 2168.

Twitter's effort to escape the plain language of this statute is unpersuasive. The company raises its Terms to argue that it does not "generally and indifferently" offer its services to all." (D.27 at 27:20-26.) Uber raised a similar argument "that it is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app," and Magistrate Judge Corley rejected it. *Doe v. Uber Techs., Inc.*, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019) (holding "[c]ommon carrier liability can attach even for transportation services that are of possible use to only a fraction of the population" (internal quotation marks omitted)); *see also Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016) (holding that plaintiff had plausibly alleged that Uber is a common carrier under section 2168). Twitter cites other federal cases regarding the common carrier status of social media platforms, (D.27 at 17:28-18:8), but none of those dealt with section 2168. Twitter also argues that section 2168 does not apply because the company "does not charge users to post or send content." (*Id.* at 18:10). But the lack of a charge does not defeat common carrier status, since the "[t]he reward may be the profit generated indirectly by easing customers' way through the carriers' premises." *Huang v. The Bicycle Casino, Inc.*, 4 Cal. App. 5th 329, 339 (2016); *see also id.* at 340 (holding there are triable issues of fact where casino did not charge for shuttle services, but "reward from the shuttle by transporting passengers to its premises, where they disembarked, gambled, and lost money to the casino"). Mr. Berenson pleads such indirect reward here. (D.1 ¶ 23.) And even assuming Twitter is not carrying messages "for profit," in California "[c]arriers without reward are subject to the same rules as employÉ's [sic] without reward, except so far as is otherwise

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

provided by this Title." Cal. Civ. Code § 2089. Section 2168 is in the same title as section 2089. *See* Cal Civ. Code div. 3, pt. 4, tit. 7.

Finally, the First Amendment does not bar application of California's common carrier law to Twitter. When it sustained the Fairness Doctrine against a constitutional challenge, the Supreme Court explained that "[t]he right of free speech of a broadcaster, the user of a sound truck, or any other individual does not embrace a right to snuff out the free speech of others." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387 (1969). The two district court decisions Twitter cites, *O'Handley* and *NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021), do not cite or discuss *Red Lion*. Nor do those decisions explain why Twitter should be viewed as a newspaper under *Miami Herald*, as opposed to a broadcaster under *Red Lion*. And as the Ninth Circuit noted in *Paxton*, "*Miami Herald* addressed government regulations or statutes which themselves required balance," which is not the case here. *Paxton*, 2022 WL 610352, at \*5. Twitter's motion to dismiss Count III should be denied.

## IV.     Mr. Berenson has a viable Lanham Act claim. (Count II)

In the Ninth Circuit, a Lanham Act false advertising claim requires

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Mr. Berenson pled facts sufficient to satisfy each of these elements. Specifically, Mr. Berenson pled that Twitter falsely labeled Mr. Berenson's tweets misleading, and then branded him a serial violator of its COVID-19 misinformation rules, all of which gave Twitter and its media partners a competitive advantage, and while at the same time causing Mr. Berenson commercial harm in the form of a smaller market for his journalism. (D.1 ¶¶ 166, 169, 171.)

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

ENVISAGE LAW

1    Twitter says its statements are non-actionable for three primary reasons. First, the

2    company says its statements are not factual assertions, but rather opinions. But Twitter did not

3    couch any of the statements at issue as opinions. The company did not tell media that it was "its

4    opinion" or "its view" that Mr. Berenson violated its COVID-19 misinformation policy, Twitter

5    asserted he in fact did so, "repeated[ly]." Similarly, the specific tweets the company labeled

6    "misleading" are not presented as opinion, but rather as assertions that Mr. Berenson in fact

7    tweeted misleading information. And yet, in its motion, Twitter fails to come forward with an

8    explanation as to how any of Mr. Berenson's reporting was in fact misleading.

9    Second, Twitter argues its statements are not commercial speech or advertising. "In order

10   for representations to constitute 'commercial advertising or promotion' under Section

11   43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial

12   competition with plaintiff; (3) for the purpose of influencing consumers to buy defendants'

13   goods or services[, and] . . . (4) must be disseminated sufficiently to the relevant purchasing

14   public to constitute 'advertising' or 'promotion' within that industry. *Coastal Abstract Serv., Inc.*

15   *v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (internal quotation marks omitted).

16   At the very least, Twitter is a competitor of Mr. Berenson's inasmuch as it proclaims to be a

17   publisher, which it does when asserting the benefits of section 230. (*See* D.27 at 32:4-5). Further,

18   Mr. Berenson alleges that the statements Twitter made about him caused consumers to turn both

19   to Twitter and other news outlets with which the company has relationships. (D.1 ¶ 155.) The

20   statements themselves might not have offered a good or a service, but they were made in the

21   context in which Mr. Berenson offers his services—in and to the media—and to actual and

22   potential readers of his journalism.

23   Third, Twitter maintains that Mr. Berenson did not sufficiently plead an injury here,

24   pointing to the fact that his Twitter following increased even as the company labeled his tweets.

25   That fact does not exclude the possibility that his following would have been even greater had

26   Twitter not engaged in the conduct at issue. Even today, Twitter's labeling of Mr. Berenson's

27   tweets as misleading continues to be cited against him and hurt his effort to gain readers.

28

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

1    Further, if given leave to amend, Mr. Berenson can plead that at some point after Twitter

2    banned him on August 28, Twitter changed the language it used to describe Mr. Berenson's

3    tweets. It no longer labels them as misleading. But because the company has hidden Mr.

4    Berenson's tweets from the public as part of its account suspension, only he and Twitter itself

5    can see the new labels, and the old and deceptive labels continue to injure Mr. Berenson.

6    **V.    Twitter violated California's Unfair Competition Law. (Count IV)**

7    The California Unfair Competition Law or UCL "is designed to ensure fair business

8    competition and governs both anti-competitive business practices and consumer injuries." *Fraley*

9    *v. Facebook, Inc.*, 830 F. Supp. 2d 785, 810 (N.D. Cal. 2011) (internal quotation marks omitted).

10   The UCL's "scope is sweeping, and its standard for wrongful business conduct is intentionally

11   broad, allowing courts maximum discretion to prohibit new schemes to defraud." *Id.* Mr.

12   Berenson pleads several predicates for UCL liability, including Twitter's labeling of his tweets,

13   and violation of the California common carrier law. (D.1 ¶¶ 188, 192.)

14   Twitter argues Mr. Berenson has not stated a cognizable injury under the UCL. Mr.

15   Berenson has alleged that Twitter's conduct caused him to lose access to his followers such that

16   he is not "able to publish his reporting, promote his booklets and new book, and sell

17   subscriptions to his Substack account." (D.1 ¶ 192.) The *Fraley* court found that a class of

18   plaintiffs with a far more speculative injury could assert a UCL claim based on "a right to be

19   paid for their endorsements and can establish how much these endorsements are worth," even

20   though the plaintiffs were not "models or celebrities per se." *Fraley*, 830 F. Supp. 2d at 811-12.

21   If those plaintiffs had an injury, so does Mr. Berenson. Related, Twitter points out that damages

22   are not available under the UCL, but only restitution and injunctive relief. (D.27 at 23:2-13).

23   Even so, Mr. Berenson still has an injury, and asked for injunctive relief. Further, the UCL

24   allows Mr. Berenson to recover restitution from Twitter, and here that could be on the grounds of

25   Twitter's interference with Mr. Berenson's access to his Twitter following or otherwise that the

26   company's conduct allowed it to monetize his account while he could have been building a

27   following on other platforms.

28

ENVISAGE LAW

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

1    Twitter also argues its statements were not commercial speech, but that argument is

2    unpersuasive for the reasons given above regarding Mr. Berenson's Lanham Act claim. Twitter

3    finally argues that Mr. Berenson pled insufficient facts that Twitter's conduct was "unlawful,

4    unfair, or fraudulent." But Mr. Berenson has stated claims under the unlawful prong, for at least

5    violation of the California common carrier law. Further, Mr. Berenson has alleged sufficient

6    facts that Twitter's conduct was unfair if not fraudulent. In its motion, Twitter does nothing to

7    explain what Mr. Berenson did to violate the company's COVID-19 misinformation policy.

8    Additionally, also in its motion, the company takes the position that its executive's assurances to

9    Mr. Berenson regarding Twitter's approach to COVID-19 content were essentially meaningless.

10   Such disputes cannot be resolved at the motion to dismiss stage.

11   **VI.    Mr. Berenson's complaint states a claim for breach of contract. (Count V)**

12   "The elements of a cause of action for breach of contract are: (1) the contract, (2)

13   plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the

14   resulting damages to plaintiff." *Coles v. Glaser*, 2 Cal. App. 5th 384, 391 (2016) (internal

15   quotation marks omitted). Mr. Berenson alleged the existence of a contract between him and

16   Twitter (D.1 ¶ 199), that Twitter breached the contract by suspending his account in violation of

17   the company's COVID-19 misinformation rules, (*id.* ¶¶ 137-150), and that the breached caused

18   damages, (*id.* ¶ 206). In its motion, Twitter does not challenge Mr. Berenson's prima facie case

19   or contest Mr. Berenson's analysis and application of its rules. Instead, the company says it can

20   suspend users "for any or no reason." (D.27 at 24:23-28.)

21   In August 2021, Twitter left no doubt as to why it banned Mr. Berenson: "repeated

22   violations of our COVID-19 misinformation rules." (D.1 ¶ 135.) Even its motion to dismiss,

23   Twitter says it "found" that Mr. Berenson's tweets "violate[d] its COVID-19 misleading

24   information policy," (D.27 at 9:18), and that he committed "repeated violations of Twitter's

25   COVID-19 misinformation policy," (*id.* at 9:23-24). But in its motion, Twitter does not deign to

26   explain how Mr. Berenson violated that policy. Nor does the company refute his analysis of its

27   rules. Instead, the company cites language in its Terms allowing Twitter to cut service "for any

28

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

or no reason," (*id.* at 24:26), before dismissing its prior censorship justification, that Mr.

Berenson is a source of "misinformation," as "immaterial," (*id.* at 26:3). In the company's view,

the Terms allow it to nix Mr. Berenson's account regardless of Twitter's previous rationale.

Twitter's reliance on the "for any or no reason" language in the Terms is misplaced.

"Under California law, a written agreement may be modified by the parties' conduct, even if the

written agreement includes a clause expressly prohibiting modification." *Alvarado Orthopedic*

*Rsch., L.P. v. Linvatec Corp.*, 2013 WL 2351814, at *4 (S.D. Cal. 2013). "When one party has,

through oral representations and conduct or custom, subsequently behaved in a manner

antithetical to one or more terms of an express written contract, he or she has induced the other

party to rely on the representations and conduct or custom. In that circumstance, it would be

equally inequitable to deny the relying party the benefit of the other party's apparent

modification of the written contract." *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d

1379, 1388 (1989).

In this case, Twitter gave Mr. Berenson specific, personalized assurances that his

reporting "should not be an issue at all," and that he should "not expect" to "see major change in

how we are addressing things going forward." (D.1 ¶¶ 84-85). At no point during these

interactions did the company inform Mr. Berenson that it could suspend him for no or any reason

anyway. At the same time, in its COVID-19 misinformation policy, which the company issued

after the Terms, Twitter established the standard content "must" meet in order to constitute a

"strike" worthy of suspension. (*Id.* ¶ 98.) Nothing in the policy suggests it is window dressing.

Twitter even told Mr. Berenson that "your name has never come up in discussions around these

policies." (*Id.* ¶ 110.)

Given Mr. Berenson's reliance on Twitter's actions and statements, it would be at the

least "inequitable" under *Wagner* to allow Twitter to bypass its "apparent modification" of the

Terms to shutdown his account using the "for any or no reason" as a litigation-induced, post hoc

escape. That is particularly the case here, since an adhesion contract is at issue, which should be

construed against Twitter. *See City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375,

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

ENVISAGE LAW

397 (2008) (referring to the "special construction rules" that apply to adhesion contracts such as construing terms against the drafter). Further, this adhesion contract lacks a merger, integration, or anti-modification clause. (D.1 ¶ 134.) Ultimately, "[t]he conflict between the written agreement's express terms and the apparently inconsistent conduct of the parties raises genuine factual disputes as to whether the parties intended to modify the contract," questions not for summary judgment, much less a motion to dismiss. *Alvarado*, 2013 WL 2351814, at *5 (denying summary judgment).[5]

The cases Twitter relies on present different circumstances. They involved different sets of rules than those here while also lacking the extracontractual touchpoints between the plaintiffs and defendants present here. *See Daniels*, 2021 WL 1222166, at *2 (applying YouTube's terms of services and community guidelines); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *7 (N.D. Cal. May 9, 2019) (applying Facebook's Self-Serve Ad Terms); *Sweet v. Google Inc.*, 2018 WL 1184777, at *3 (N.D. Cal. Mar. 7, 2018) (rejecting breach of contract claim involving YouTube's community guidelines and advertising programs); *Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215, 1220 (N.D. Cal. 2011) (applying PayPal's user agreement). There is no indication in these cases that the defendants told plaintiffs their conduct "should not be an issue at all" or gave similar assurances.

The decision in *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12 (2021), is arguably the most analogous case, because it involved the same defendant. There, the court rejected the plaintiff's breach of contract claim, citing the "for any or no reason" provision in the Terms, after the company permanently suspended the plaintiff's account for violating its hateful conduct policy. *Id.* at 35. Twitter's pre-ban statements to the plaintiff in *Murphy* uniformly stated her tweets

_____

[5] Twitter's argument that Cal. Civ. Code § 2175 does not apply to the exculpatory language in its Terms is not persuasive. (D.27 at 25:23-25). Twitter is, in fact, a common carrier under the terms of Cal. Civ. Code § 2168, and the court in *Murphy*, which Twitter cites, simply did not consider the question.

16

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

1  violated the company's policies. *See id.* at 20 (citing four violative tweets). Unlike this case,

2  *Murphy* lacked the facts for modification, reliance, and equitable enforcement under *Wagner*.

3      Twitter's reliance on its Terms is problematic for another reason. Mr. Berenson joined

4  Twitter in November 2009. (D.1 ¶ 60.) If given leave to amend, he can show that under Twitter's

5  then terms of service, the company disclaimed censorship, and excluded "any services for which

6  you have a separate agreement with Twitter that is explicitly in addition or in place of these

7  terms." Twitter reserved the right to modify those terms, but promised to give users written

8  notice of any material changes. Upon information and belief, Twitter never gave Mr. Berenson

9  the required notice, creating a fact question about which terms apply.

10 **VII.   Mr. Berenson has a viable promissory estoppel claim. (Count VI)**

11     "[P]romissory estoppel requires (1) a promise clear and unambiguous in its terms, (2)

12 reliance by the party to whom the promise is made, (3) the reliance must be reasonable and

13 foreseeable, and (4) the party asserting the estoppel must be injured by his or her reliance."

14 *Murphy*, 60 Cal. App. 5th at 38. While actual reliance is not at issue, Twitter argues Mr.

15 Berenson has failed to state a claim regarding the other three elements.[6]

16     **A.  Twitter's promises were sufficiently definite.**

17     "To be enforceable, a promise need only be definite enough that a court can determine

18 the scope of the duty, and the limits of performance must be sufficiently defined to provide a

19 rational basis for the assessment of damages." *Garcia v. World Sav., FSB*, 183 Cal. App. 4th

20 1031, 1045 (2010). California courts have found conditional promises meet this requirement, *see*

21 *id.* (citing cases, including case where court "enforced borrower's promise that 'if' he obtained

22

23 [6] Twitter's analysis of the fourth element, injury, is consigned to a footnote. Twitter cites

24 *Panaszewicz v. GMAC Mortg., LLC*, 2013 WL 2252112, at *5 (N.D. Cal. May 22, 2013), for the proposition that Mr. Berenson did not show "a sufficient change of position." (D.27 at 26 n.9.)

25 But that case does not dispel Mr. Berenson's injury, namely his continued presence on Twitter building a following there when other options were available to him, particularly when courts

26 have found promises sufficient if they induced parties to forego action. *See, e.g.*, *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 804 (2013) (noting defendant "caused

27 [plaintiff] not to take legal action").

28

        17               **Alex Berenson's Reponse to Twitter's Motion to Dismiss Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

earthquake insurance, lender would be loss payee"), even if the condition "might not occur," *id.* A promise to use "best efforts" in acquiring land, even where the timeline for acquisition was "subject to amendment 'from time to time'," was found sufficiently definite to defeat a motion to dismiss. *US Ecology, Inc. v. State of California*, 92 Cal. App. 4th 113, 136 (2001).

Twitter made multiple promises to Mr. Berenson and to the public at large. In May 2020, the company published a blog post on its "approach to misleading information." (D.1 ¶ 74.)[7] The company issued the following grid illustrating its enforcement approach:



| | Moderate | Severe |
|---|---|---|
| **Misleading Information** | Label | Removal |
| **Disputed Claim** | Label | Warning |
| **Unverified Claim** | No action | No action* |

Propensity for Harm

Here, Twitter identified only one category of tweets as subject to removal: "misleading information," specifically "statements or assertions that have been confirmed to be false or misleading by subject-matter experts, such as public health authorities," (*id.* ¶ 75), and only then if the information might cause "severe" harm, (*id.* ¶ 77).

The same day the company published details regarding its enforcement approach, Twitter executive Brandon Borrman contacted Mr. Berenson to encourage and reassure him that Twitter believed debate about COVID-19 policy "*should continue.*" In December 2020 and March 2021, Mr. Borrman again reassured Mr. Berenson that Twitter knew of and did not plan to act against

---

[7] Yoel Roth & Nick Prickles, *Updating our approach to misleading information*, Twitter (May 11, 2020), https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleadinginformation.

his reporting. By then, Mr. Berenson had repeatedly and vigorously argued and reported that public health authorities were overstating the efficacy of the COVID-19 vaccines and underestimating their side effects.

Until July 2021, several months after Mr. Borrman's latest promise to him, Mr. Berenson continued to report as aggressively as ever without having access to his account limited in any way. If conditional promises or an even vaguer, open-ended "best efforts" promise is sufficient to state a claim for promissory estoppel, *US Ecology*, 92 Cal. App. 4th at 136, then so are the various promises at issue here.

Twitter characterizes its promises as inconsequential statements regarding "generalized goal[s], "past action, not future promises," "how system[s] work," and "predictions, not promises." (D.27 at 27:14, 27:23, 28:5, 28:13.) Twitter's analysis is unavailing for at least two reasons. First, Twitter isolates relevant statements as opposed to construing them as part of an overall course of conduct. But when analyzing promissory estoppel claims, California courts "do not read passages from a complaint in isolation; in reviewing a ruling on a demurrer, we read the complaint 'as a whole and its parts in their context.'" *West*, 214 Cal. App. 4th at 804 (quoting *City of Dinuba v. Cnty. of Tulare*, 41 Cal. 4th 859, 865 (2007)); *see also Cranston/BVT Assocs., Ltd. P'ship v. Sleepy's, LLC*, 2015 WL 5793693, at *3 (D.R.I. Sept. 30, 2015) (holding that "the parties' prior course of dealings creates questions of fact" regarding whether there was a "clear, unambiguous promise"). The court in *West* found the plaintiff had sufficiently alleged a bank's "alleged misrepresentations" were sufficient to create cognizable reliance interests. *West*, 214 Cal. 4th at 804. Twitter focuses on snippets of Mr. Borrman's statements, but does not consider them in depth or how its other statements created reliance interests.

Second, the cases Twitter relies upon are inapplicable. Many of those cases involve one-off or otherwise undeveloped statements made by junior employees at banks or mortgage companies about property foreclosures. *See, e.g.*, *Zierolf v. Wachovia Mortg.*, 2012 WL 6161352, at *7 (N.D. Cal. Dec. 11, 2012) (holding "[m]ere allegations" that defendant "made, on several occasions, clear and unambiguous promises to Plaintiff to work on modifying his loan"

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

1  are insufficient for promissory estoppel claim); *Granadino v. Wells Fargo Bank, N.A.*, 236 Cal.

2  App. 4th 411, 417 (2015), *as modified* (Apr. 29, 2015) (rejecting alleged promise that was "mere

3  statement of fact: appellants were being reviewed for a loan modification and there was no

4  trustee's sale pending"). Other cases like *Murphy* (discussed above) and *Herrick v. Grindr, LLC,*

5  306 F. Supp. 3d 579 (S.D.N.Y. 2018), addressed terms of service and other published statements,

6  not with direct, personal statements to the plaintiffs. *See Herrick*, 306 F. Supp. 3d at 598

7  (rejecting theory that "the community values page and Terms of Service constitute a promise to

8  monitor and remove content"); *Murphy*, 60 Cal. App. 5th at 38 (identifying various, general

9  statements made by Twitter). Twitter's cases do not present facts like this case, where Twitter

10  repeatedly, over many months, through published statements and personalized outreach assured

11  Mr. Berenson that he could continue reporting on the platform.

12  A far more appropriate parallel is *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009).

13  In that case, a Yahoo user complained to the company about a profile containing "nude

14  photographs of [the plaintiff] and her boyfriend," which spurred unwanted advances. *Id.* at 1098.

15  The plaintiff asked Yahoo to take the profile down. *Id.* After months of silence, a Yahoo

16  communications executive finally "broke [the company's] silence," and promised to "personally

17  walk the statements over to the division responsible for stopping unauthorized profiles and *they*

18  *would take care of it.*" *Id.* at 1099 (emphasis added). The Ninth Circuit held that statement alone

19  was sufficient to support a promissory estoppel claim. *Id.* at 1109. Twitter's repeated assurances

20  and course of conduct compare favorably to the single statement at issue in *Barnes*, which itself

21  was made by someone who lacked the power to take direct action to make good on the promise.

22  By contrast, here, Mr. Berenson alleges Twitter made multiple statements to him, the first of

23  which was entirely unsolicited. Like the promissory estoppel claims at issue in *West, Cranston*,

24  *Barnes*, Mr. Berenson's allegations raise fact issues that should not be resolved at this stage.

25  **B.  Mr. Berenson's reliance on Twitter's promises was reasonable.**

26  Regarding reasonable reliance, the only questions at this stage of the litigation are

27  whether "reasonable minds can come to only one conclusion based on the facts," *Daniels v.*

28

**Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA**

ENVISAGE LAW

ENVISAGE LAW

1    *Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1179 (2016) (quoting *All. Mortg. Co. v.*

2    *Rothwell*, 10 Cal. 4th 1226 (1995)), and whether "no reasonable person would rely" on the

3    statements, *id.* (quoting *Granadino*, 246 Cal. App. 4th at 418).[8] Mr. Berenson's allegations, (D.1

4    ¶¶ 68-116), regarding Twitter's various statements provide a basis for a such a conclusion.

5         Twitter provides three reasons why no reasonable person in Mr. Berenson's position

6    would rely on the company's statements, none of which are persuasive. The first is that Mr.

7    "Borrman—a communications executive—made clear to Plaintiff he played no role in

8    enforcement decisions." (D.27 at 29:16). According to Twitter, Mr. Berenson "cannot have

9    reasonably relied on qualified statements by an employee who was transparent about his lack of

10   authority." (*Id.* at 29:17-18.)

11        Contrary to Twitter's claims that Mr. Borrman lacked authority on enforcement issues, he

12   spoke directly about such matters. When, in March 2021, Mr. Borrman qualified his email by

13   writing "I am not always made aware of [enforcement actions] before they're executed," he

14   immediately included the assurance that "[i]f something happens, please let me know." (D.1

15   ¶ 110.) In December 2020, after the company announced new COVID-19 vaccine policies, Mr.

16   Borrman again invited Mr. Berenson to "[p]lease let me know if you run into any issues." (*Id.*

17   ¶ 103.) Mr. Borrman repeatedly offered Mr. Berenson a personalized route to review Twitter's

18   enforcement activities.

19        These statements carried even greater weight considering the context of Mr. Borrman's

20   outreach to Mr. Berenson. The same day Twitter chief executive Jack Dorsey followed Mr.

21   Berenson's account, Mr. Borrman contacted Mr. Berenson for the first time. (D.1 ¶ 81.) If given

22   leave to amend, Mr. Berenson can plead additional facts that led him to conclude Mr. Borrman

23   was speaking on behalf of Mr. Dorsey. Mr. Berenson can plead that, after their initial exchange,

24   Mr. Berenson asked Mr. Borrman if he could report his exchange with a "senior Twitter

25

26   [8] On March 7, the California Supreme Court issued a decision "disapproving" of *Daniels*, to the
     extent it conflicts with *Sheen v. Wells Fargo Bank, N.A.*, 2022 WL 664722, at *22 n.12 (2022),

27   but not of the propositions cited here.

28

                                        21                    **Alex Berenson's Reponse to**
                                                              **Twitter's Motion to Dismiss**
                                                              **Case No. 3:21-CV-09818-WHA**

executive" to his Twitter followers. Mr. Borrman agreed, but asked Mr. Berenson to make it clear that Mr. Dorsey was not the executive, not because Mr. Borrman lacked the authority to speak for Mr. Dorsey, but because Mr. Borrman wanted to avoid "dragging [Mr. Berenson] into" a controversy related to Mr. Dorsey. Mr. Berenson believed Mr. Borrman was speaking for Twitter's CEO, and contemporaneously sent a direct message over Twitter to a well-known Twitter user relating his belief that Mr. Borrman "was speaking on behalf of jack, but jack doesn't want to email me directly." Far from being "transparent" regarding his lack of authority as Twitter maintains, (D.27 at 29:18), Mr. Borrman gave Mr. Berenson every reason to believe that he spoke for the company, and that Mr. Berenson had support to keep reporting from the company's CEO.

Twitter's second rationale relates to the definiteness of Mr. Borrman's statements, issues already discussed above. The courts in the cases Twitter cites, *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387 (N.D. Cal. 2017) and *Foster v. Reverse Mortg. Sols., Inc.*, 2020 WL 4390374 (C.D. Cal. May 13, 2020), rejected promissory estoppel claims because promises to "review" loans, *Faulks*, 231 F. Supp. 3d at 405, and "consider" repayment plans, *Foster*, 2020 WL 4390374, at *8, were not definite enough. Those comparatively isolated statements from junior employees are not analogous to Mr. Borrman and Mr. Berenson's nearly year-long dialogue.

For its third rationale, Twitter again invokes the Terms, arguing that Mr. Berenson could not have reasonably relied on its statements given the "for any or no reason" clause. But that argument assumes that the Terms, which lack a merger, integration, or anti-modification clause, were not in fact modified by Twitter's statements, policies, and course of conduct, which is what Mr. Berenson contends happened here. (*See* Section VI *supra*).

## VIII.   Mr. Berenson's unjust enrichment claim is viable. (Count VIII)

Twitter's unjust enrichment claim is not a repackaging of Mr. Berenson's contract claim. The claim is premised on the theory that, from Twitter's perspective, for a certain period, Mr. Berenson's reporting appeared on the platform in violation of its rules. Any financial benefit Twitter received from such was unjustly earned, and Twitter should not be allowed to retain it.

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

**ENVISAGE LAW**

1  **IX.  The First Amendment does not prohibit Mr. Berenson's claims.**

2       Twitter maintains the First Amendment gives it blanket immunity against Mr. Berenson's

3  claims in this case. (D.27 at 31:10-32:2.) In *Paxton*, the Ninth Circuit considered the

4  applicability of the First Amendment to the Texas Attorney General's investigation into

5  Twitter's content moderation practices and statements that the company "does not moderate

6  content based on political viewpoint." 2022 WL 610352 at *1. The court rejected the company's

7  argument that "matters of 'editorial judgment' can never be investigated" under the First

8  Amendment. *Id.* at *5. The court noted that Twitter "made statements about balance," and that

9  those statements could be investigated just like the statements of any other business." *Id.* The

10 court also determined that "a reasonable person could think that Twitter's statements about

11 content moderation were true." *Id.*

12      To the extent Twitter's own statements and conduct are at issue in this litigation, and they

13 are in at least Mr. Berenson's Lanham Act, UCL, breach of contract, and promissory estoppel,

14 claims, then the First Amendment does not bar any of those claims, just as it would not against

15 "any other business." Twitter's First Amendment objections to Mr. Berenson's other California

16 law claims are discussed above. (*See* Sections III and IV *supra*.)

17 **X.  The Communications Decency Act does not bar Mr. Berenson's claims.**

18      Twitter raises section 230 of the Communications Decency Act or CDA, 47 U.S.C.

19 § 230, as a defense. "The cases do not describe a one-size-fits all rule for when to apply the

20 CDA." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1044 (N.D. Cal. 2014). Section 230 does

21 not categorically bar commercial tort, breach of contract, or promissory estoppel claims. *See*

22 *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1054 (9th Cir. 2019),

23 *cert. denied*, 141 S. Ct. 13 (2020) (holding that "immunity under [section 230] does not extend to

24 anticompetitive conduct"); *Barnes*, 570 F.3d at 1109 (holding that "subsection 230(c)(1) . . . does

25 not preclude" a claim "alleg[ing] breach of contract . . . under the theory of promissory

26 estoppel"); *Darnaa, LLC v. Google, Inc.*, 2016 WL 6540452, at *8 (N.D. Cal. Nov. 2, 2016)

27 (holding that 47 U.S.C § 230(c)(1) does not bar claim "for breach of defendants' good faith

28

**Alex Berenson's Reponse to**
                                              **Twitter's Motion to Dismiss**
                                              **Case No. 3:21-CV-09818-WHA**

contractual obligation to plaintiff"). Twitter does not explicitly raise section 230(c)(2), but if it did, at a minimum, it would have to find Mr. Berenson's reporting was "objectionable for the reasons it gives," *Darnaa*, 2016 WL 6540452, at *8. This is part of the "good faith" requirement incorporated into section 230(c)(2) itself. Here, Twitter has not even attempted to show how Mr. Berenson violated its policies, offering only conclusory assertions that he did so.

Another reason section 230 does not apply here is that Twitter is itself a content provider with respect to Mr. Berenson. Twitter labeled his tweets misleading. (D.1 ¶¶ 113-14.) By doing this, Twitter went beyond "traditional editorial functions," adding its expression to Mr. Berenson's speech. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162–63 (9th Cir. 2008) (en banc) ("But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider. Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content."); *Fraley*, 830 F. Supp. 2d at 802 (rejecting section 230 motion to dismiss on grounds defendant was an "information content provider").

Finally, Twitter misses Mr. Berenson's point regarding the relationship between section 230 and the First Amendment. (D.27 at 33:27-28.) In *Railway Employees Department v. Hanson*, 351 U.S. 225 (1956), the Supreme Court considered the interplay between a provision of the Nebraska Constitution which prohibited employers from "exclud[ing] persons from employment because of membership in or nonmembership in a labor organization" and a federal statute that empowered employers to "requir[e] all employees within a stated time to become a member of the labor organization." *Id.* at 228. Even though "private rights" were at issue, the Supreme Court determined the case raised "justiciable questions" under the First Amendment regarding association rights because "[i]f private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded." *Id.* at 232.

Similarly, if California law requires Twitter to carry Mr. Berenson's reporting, then using section 230, a federal statute, to censor him raises First Amendment issues because federal law "is the source of the power and authority by which" his speech "rights are lost or sacrificed." *Id.*

Alex Berenson's Reponse to
Twitter's Motion to Dismiss
Case No. 3:21-CV-09818-WHA

at 232. In other words, but for section 230, a federal law, Twitter would not be able to censor Mr. Berenson under California law. Mr. Berenson would be able to speak akin to the way employees in *Hanson* could have declined to become part of a labor union under the Nebraska Constitution. In this regard, the application of section 230 to Mr. Berenson in this case raises First Amendment concerns.

## CONCLUSION

For the foregoing reasons, Mr. Berenson respectfully prays that this Court denies Twitter's motion to dismiss or, alternatively, grants him leave to amend his original pleading.

ENVISAGE LAW

25

**Alex Berenson's Reponse to**
**Twitter's Motion to Dismiss**
**Case No. 3:21-CV-09818-WHA**

1  Dated: March 16, 2022

2                                    ENVISAGE LAW

3
                                     By:    */s/ James R. Lawrence, III*
4                                           James R. Lawrence, III
                                            Anthony J. Biller
5
                                     CHARIS LEX P.C.
6
7                                           Sean Gates

8                                    *Attorneys for Alex Berenson*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ENVISAGE LAW

**Alex Berenson's Reponse to**
                                            **Twitter's Motion to Dismiss**
                                            **Case No. 3:21-CV-09818-WHA**